[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 164 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 165 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 166 
Jack Harrison Trawick was convicted of the capital offense of murder committed during a first-degree kidnapping and was sentenced to death. See Ala. Code 1975, § 13A-5-40(a)(1). The Court of Criminal Appeals affirmed his conviction and sentence in Trawick v. State, 698 So.2d 151 (Ala.Cr.App. 1995). This Court has granted his petition for the writ of certiorari; see Rule 39(c), Ala.R.App.P. We affirm.
 I.
The Court of Criminal Appeals stated the facts of this case in its opinion, and we will repeat only these pertinent details: Trawick abducted Stephanie Gach* from the parking lot of her apartment complex in Birmingham on October 9, 1992, after following her home from a local shopping mall. Trawick took Gach to an isolated area, where he beat her with a hammer, strangled her, stabbed her through the heart, and tossed her body off an embankment. Her body was found on October 10, 1992.
On October 26, 1996, while investigating reports of several attempted abductions of women, the Jefferson County Sheriff's Department interviewed Trawick as a suspect in relation to those reports. During a second interview, the police asked Trawick whether he had had any involvement with the murder of Stephanie Gach. In a third interview, conducted on October 29, 1996, Trawick indicated that he knew something about the murder and, in a fourth interview conducted on the same day, Trawick confessed to the crime; he was then arrested for it.
The grand jury indicted Trawick for the capital offense of murder committed during a first-degree kidnapping. After arraignment, he pleaded not guilty and not guilty by reason of mental disease or defect. After a trial, the jury found Trawick guilty of capital murder and by a vote of 10-2 recommended a sentence of death; the trial court sentenced him to death in accordance with this recommendation.
Although we have carefully reviewed the many issues Trawick raises in his brief, we will address only the primary issues and those issues that were not discussed in the opinion of the Court of Criminal Appeals.
 II
Trawick first argues that the trial court committed several reversible errors during the process of jury selection. We note from the outset that Trawick did not object to these alleged errors at trial. We therefore review these issues only for plain error, i.e., error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Taylor,666 So.2d 73 (Ala. 1995). The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant. Taylor.
Trawick first argues that the State used its peremptory challenges to discriminate against female jurors, in violation of J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419,128 L.Ed.2d 89 (1994), and that the trial court erred by not requiring the State to articulate its reasons for its strikes of females. He points out that the State used 11 of its 14 peremptory strikes to remove women from Trawick's jury, resulting in a petit jury that was composed of 7 men and 5 women. He also argues that the prosecutor had a history of striking veniremembers based upon race. He thus concludes that his case should be remanded for a hearing on the State's reasons for striking women.
In J.E.B. v. Alabama, the United States Supreme Court extended the principles of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to apply to gender discrimination in jury selection. A party making a Batson orJ.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609
(Ala. 1987); Ex parte Bird, 594 So.2d 676 (Ala. 1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; *Page 168 
those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.
At trial, Trawick objected to the State's peremptory strikes, but objected solely on the basis of race, not gender. Trawick has offered no evidence that the female veniremembers shared only the characteristics of gender, that anything in the type or manner of the prosecutor's statements or questions during the extensive voir dire indicated an intent to discriminate against female jurors, that there was a lack of meaningful voir dire directed at the female jurors, or that female jurors and male jurors were treated differently. He has offered no evidence that the prosecutor had a history of using peremptory challenges in a manner that discriminated against veniremembers of eithergender. Instead, Trawick has merely emphasized that the State used many of its strikes to remove women from the venire. Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination.
Trawick next argues that during voir dire, jurors W.M. and W.C. indicated they were prejudiced against Trawick and his case, and that they therefore should have been struck from the venire for cause. Trawick argues that both of these jurors had preconceived opinions based upon media accounts of the murder and that W.C. also indicated a bias against the insanity defense in general. During voir dire, Trawick moved to strike juror W.C., but did not object to juror W.M. He also failed to raise this issue as to either of the jurors before the Court of Criminal Appeals or in his certiorari petition. Trawick nevertheless argues that it was plain error for the trial court to deny his motion to strike W.C. for cause and for it not to strike juror W.M. sua sponte.
To justify a challenge for cause, there must be a proper statutory ground or some matter that imparts absolute bias or favor and leaves nothing to the discretion of the trial court. Clark v. State, 621 So.2d 309 (Ala.Cr.App. 1992). This Court has held that once a juror indicates initially that he or she is biased or prejudiced, or has deep-seated impressions about a case, the juror should be removed for cause. Knop v.McCain, 561 So.2d 229 (Ala. 1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, supra. A juror need not be excused merely because he or she knows something of the case to be tried or has formed some opinions regarding the case. Kinder v. State,515 So.2d 55 (Ala.Cr.App. 1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, In order to justify disqualification, a juror must have more than a bias or an opinion as to the guilt or innocence of the accused; the bias or opinion must be so fixed that the juror cannot lay it aside and render a verdict based on the evidence presented in court.Oryang v. State, 642 So.2d 979 (Ala.Cr.App. 1993).
Trawick bases his argument as to juror W.M. on statements W.M. made during individual voir dire, after he had indicated in *Page 169 
general voir dire that he "knew something" about Trawick's case. The statements in question are as follows:
 "QUESTIONS BY THE COURT: "Q. [W.M.], you recall something about the litigation? . . .
 "A. Yes. [I read] in the paper about the confession.
"Q. Did you read the paper this morning?
"A. Yes, sir.
"Q. About the case?
"A. That's the most recent memory of it.
 "Q. What details do you remember? You said the confession. Any other details?
 "A. Tape over the mouth, stabbing of the heart, how he followed his — he saw his victim at Eastwood Mall and followed her to her apartment and forced her into the van with the toy gun.
 "Q. Well, I asked everybody out there about the ultimate question to you, sir. Any verdict in the case, of course, cannot be tainted with what you might have read in the paper. That's not evidence, as you well know. The verdict should be the product and based only on the courtroom evidence and the law. Could you abide by those instructions and bring in a verdict based only on the in-court evidence?
 "A. I guess I want to say I could but I am not really sure, you know. I don't know if I could or not.
"Q. Do you have some misgivings about that?
 "A. Well, just that I have already formed an opinion.
 "Q. Well, can you set that opinion aside and base your verdict on the in-court evidence?
"A. I think I could."
(Emphasis added.)
Although W.M. stated that he had learned about the case from the newspaper and had formed an opinion of the case based upon what he had read, he nevertheless stated that he thought he could set aside that opinion and base his verdict upon the evidence he heard in court. W.M.'s answers, taken as a whole, do not reveal a fixed opinion that would bias thejuror's verdict; rather, they indicate a willingness and ability to put aside any preconceived ideas about Trawick's highly publicized case and to base a verdict upon the evidence that would be presented in the trial. We therefore find no plain error in the trial court's failure to remove W.M. from the jury sua sponte.
Trawick also argues that juror W.C.'s ability to act as an unbiased juror was tainted by a preconceived opinion as to his guilt. This argument is based upon the following statements W.C. made during individual voir dire:
"QUESTIONS BY THE COURT:
 "Q. Now, you remembered something about the case, like so many other jurors?
"A. Right.
"Q. Did you read the paper today?
"A. No, not the past couple of days.
"Q. Radio or T.V. today?
"A. No.
 "Q. Good. So your information is somewhat dated, I take it?
"A. Right.
 "Q. Any other details at all? I know the [lawyers] are interested in what details you recall.
 "A. Basically Trawick supposedly, you know, abducted that young girl and killed her and the body was found in Irondale. That's about all I know, just the general facts."
(Emphasis added.) Nothing in this colloquy indicates that W.C. was biased or believed Trawick to be guilty; on the contrary, W.C.'s statement that he had heard that Trawick "supposedly" committed the crime clearly indicated that W.C. properly regarded the charges against Trawick to be allegations, not facts.
Trawick also argues that W.C. later indicated a bias against his defense of not guilty by reason of a mental disease or defect. Because we review this argument in accordance with the plain error rule, we are *Page 170 
mindful that Trawick's failure to object at trial to this alleged error weighs against any claim of prejudice to him.Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), affirmed,577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991). During general voir dire, Trawick's counsel asked whether anyone considered a defense of not guilty by reason of insanity to be a "cop-out"; W.C. indicated that he did. During subsequent individual voir dire of W.C., the following occurred:
 "Q. [THE COURT] Just to be sure, some of us kid about the psychiatrists, and so forth. You know we cannot treat capriciously the medical community, psychiatric, psychological community. There is a lot to say about the special defense of not guilty by reason of mental disease or defect and you told me a while ago by your silence that you would listen to my instruction in this important regard.
"A. Right.
"Q. Let's see if they have any questions. . . ."
Trawick's counsel then asked W.C. if his indication that he thought the insanity defense is a "cop-out" was "kind of a knee-jerk reaction." The following exchange took place:
 "A. [Juror W.C.]: No, I mean I just feel it's greatly overused. I feel there is a lot of cases in which maybe people for instance should have gotten the death penalty and might not really have a problem. I mean, I feel a lot of times it's hard to definitively prove that someone is, you know, really, really does have a problem [sic].
 "Q. [Trawick's counsel]. But you do think it can be done?
 "A. Possibly. I would probably require more evidence than just one expert, for instance.
 "Q. So you would require someone to come in and say he is insane, more than one expert —
 "A. Probably so, definitely. I mean, I just feel it is something that is greatly overused, I mean —
"Q. That is all I have.
". . . .
 "THE COURT: [W.C.], I have got to get involved here because of something you said.
"QUESTIONS BY THE COURT:
 "Q . . . . You can't sit on the case if you have some standard of your own, so we go back to just listening to me and weighing all the evidence, expert, lay witnesses, the totality of the evidence has to be weighed and assessed, on the legal charge, whether or not one was suffering from a mental disease or defect and if the product of the actions [was] caused by that mental disease or defect. Can you abide by my instructions instead of setting up arbitrary standards?
 "A. I imagine so, it would just be tough. I mean, that's just something I feel strongly about. It seems like it's brought up in so many cases —
". . . .
 "Q. I know that. . . . Could you follow my instructions, versus setting up [your own] standards?
"A. I could."
While W.C.'s answer may indicate that he felt that the insanity defense is overused and that W.C. might therefore have difficulty believing it, he did not express an absolute bias against the defense. W.C. stated that he could follow the trial court's instructions on the defense, and the trial court had the opportunity to observe W.C.'s manner of speech, demeanor, body language, tone, and appearance as he said this. Based on W.C.'s overall responses to the questions concerning the insanity defense, and in deference to the trial court's discretion in gauging the veracity of these responses, we see no plain error in the trial court's not striking W.C. for cause.
Trawick next argues that in granting one of the State's challenges for cause the trial court violated Witherspoon v.Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Trawick correctly states that, under Witherspoon it is unconstitutional to exclude venirepersons for cause when they express *Page 171 
general objections to the death penalty; the juror may be excluded only if his or her view on capital punishment would prevent or substantially impair the performance of his or her duties as a juror. Before deciding whether a juror is excludable under Witherspoon, the trial court must first determine whether the juror, given his or her stated objections to capital punishment, could nevertheless consider the evidence and instructions of the court and in an appropriate case return a verdict of guilty although that verdict could result in the imposition of the death penalty.
During voir dire, the trial court asked the veniremembers whether any of them, because of religious, moral, or philosophical scruples, were unalterably opposed to capital punishment — specifically whether anyone was so opposed to it "that you know now before you hear a stitch of testimony, before you have heard anything about the legal components, that you know right know to a certainty that you would not vote for the death penalty." Juror N.P. answered in the affirmative. The trial court then conducted individual voir dire with N.P., wherein the following was said:
"QUESTIONS BY THE COURT:
"Q. Could you impose the death penalty?
 "A. I don't know that I could. To be truthful, I don't know that I could.
 "Q . . . . [I]s that to say you could not or you just don't know, you might could? You could hypothesize —
 "A. Theoretically you've got — truthfully, I don't think I would. I really don't think — I'm very strongly opposed to the death penalty. Personally, I don't — I don't think it — I don't think that it's constitutional, on my own — my own mind. And I have gone around and around and around on that subject with people as well.
". . . .
 "Q . . . . Now, can you play the role of the conscientious juror, or are your feelings about the death penalty so hardened that you cannot conscientiously consider death by electrocution in spite of the law and what facts might emerge in the course of the trial?
 "A. Put . . . to me that way, I would still have to come down that I would not. I do not think that. I would. I know that's vague —
 "Q. You said two things. You said that you would not and then you qualified and said you didn't think you could. And because you are a lawyer I am going to pick on you.
"A. I understand that.
"Q. How could I read this?
 "A. I would not. I feel — I can tell you that my feelings on the death penalty are stronger than — that my feelings — my feelings on death in general and death penalty are stronger than my feelings of obligation perhaps to — to that oath."
We conclude that N.P.'s statements regarding his feelings against the death penalty, and his statement of allegiance to his own feelings against it, were sufficient to justify granting the State's challenge for cause. Throughout repeated questioning, N.P. consistently indicated that his own feelings of conscience against the death penalty would outweigh his obligation to any oath to consider recommending it. We therefore find no plain error in the trial's court decision to exclude N.P. from the jury.
 III.
Trawick next raises a series of issues challenging the propriety of several instructions the trial court gave the jury. We note from the outset that these issues are raised for the first time in Trawick's brief to this Court; they were not preserved before the trial court. We therefore review these issues only within the confines of the plain error rule, and we again note that this rule is to be applied to correct errors solely in those circumstances in which a miscarriage of justice would otherwise result. Ex parte Taylor,666 So.2d 73 (Ala. 1995), cert. denied, ___ U.S. ___,116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
Trawick argues that the trial court failed to properly instruct the jurors that he was required to prove by "clear and convincing evidence" his defense of not guilty by *Page 172 
reason of mental disease or defect. Trawick contends that this failure left the jury to believe that he had to meet the higher standard of proving his mental disease or defect beyond a reasonable doubt and thus sabotaged his defense.
The record shows that the trial court gave the following jury instruction as to Trawick's defense of not guilty by reason of mental disease or defect:
 "By entering his plea of not guilty by reason of severe mental disease or defect, the defendant does assume the burden of proving by clear and convincing evidence to the reasonable satisfaction of you jurors, one, that at the time of the commission of the alleged acts constituting all or essential elements of the crime for which he is charged, that he was suffering from a severe mental disease or defect. And two, that as a result of such severe mental disease or defect, he either was unable to appreciate the nature and quality of his acts or was unable to appreciate the wrongfulness of his acts.
 "Whether or not the defendant was suffering from such severe mental disease or defect is for you people to determine from all of the evidence to your reasonable satisfaction. In making the determination of whether or not defendant Trawick here, at the time of the commission of the crime charged, was unable to appreciate the nature and quality or wrongfulness of this acts, the law provides some guidance to you in this respect.
 "The phrase 'severe mental disease or defect' does not include an abnormality of the mind which is manifested only by repeated criminal or otherwise antisocial conduct. That is to say this: any repeated criminal or other antisocial conduct of the defendant standing alone does not constitute sufficient evidence that he suffered from a severe mental disease or defect."
We note that the instruction in the Alabama Pattern JuryInstructions: Criminal defining the defense of mental disease or defect does not contain any definition of the clear and convincing evidence standard to be applied in cases where the defendant asserts that defense. The instruction set out above is, in essence, the same as the pattern instruction as to the defense of mental disease or defect that is contained in theAlabama Pattern Jury Instructions. Taken as a whole, the instructions given by the trial court properly defined how the jury was to weigh the evidence of Trawick's alleged mental disease or defect. The trial court clearly stated that the jurors needed only to find to their "reasonable satisfaction" that such a disease or defect existed in order to find Trawick not guilty, and we find nothing in this that would have misled the jury as to the standard of proof that Trawick was required to meet in order to establish his defense.
Trawick also argues that the trial court improperly failed to instruct the jury as to what the consequences for him would be if they found him not guilty by reason of mental disease or defect. He states that the trial court should have told the jury that such a verdict would mean that he would be confined to a mental hospital, perhaps for the rest of his life. He speculates that, without this instruction, the jury "may well have believed" that a verdict of not guilty by reason of mental disease or defect, like a regular verdict of not guilty, would result in his complete freedom. He concludes that the instruction left the impression that he would be left to go free and unfettered if the jury found him not guilty by reason of mental disease or defect and thus impermissibly influenced the jury to find him guilty.
We find no error in the trial court's silence as to the consequences for Trawick if the jury returned a verdict of not guilty by reason of mental disease or defect. On the contrary, its silence was entirely proper; it was not within the jury's sphere of concern to determine what these consequences would be, and statements as to such consequences should not be thrown into a case to influence the verdict,Ivery v. State, 686 So.2d 495 (Ala.Cr.App. 1996), citing Boylev. State, 229 Ala. 212, 154 So. 575 (Ala. 1934). The trial court correctly refrained from making statements regarding those consequences.
Trawick next argues that in instructing the jury the trial court erroneously defined "reasonable doubt," as that term is *Page 173 
used in regard to the standard of proof, as "an actual substantial doubt," and that this violated Cage v. Louisiana,498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In Cage, the United States Supreme Court reversed a criminal conviction because the Court concluded that the trial court's instruction impermissibly suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard established by In re Winship, 397 U.S. 358, 90 S.Ct. 1068,25 L.Ed.2d 368 (1970). Trawick likens the instruction given in this case to that at issue in Cage, and he concludes that his conviction likewise must be reversed.
In Cage, the trial court instructed, in pertinent part, that reasonable doubt "must be such doubt as would rise to a grave uncertainty [and that] it is an actual substantial doubt. It is a doubt that a reasonable man can entertain. What is required is not an absolute or mathematical certainty, but a moral certainty." 498 U.S. at 40, 111 S.Ct. at 329. The United States Supreme Court held that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for an acquittal under the reasonable doubt standard. The Court determined that these words, when considered with the reference to "moral certainty" rather than evidentiary certainty, could have led a reasonable juror to believe that a finding of guilty could be based on a lesser degree of certainty.
The portion of the jury instruction to which Trawick now objects is as follows:
 "I am going to suggest to you that proof beyond a reasonable doubt would be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own personal affairs."
Trawick argues that this statement lowered the burden of proof because, he says, it "guid[ed] the jurors' understanding about the State's burden in terms of their own personal affairs." We do not agree; on the contrary, we find that the statement effectively highlighted the high degree of proof that was necessary to prove Trawick's guilt, by describing it in a way that made it more personal for the jurors. Moreover, in the balance of its instruction, the trial court consistently emphasized the presumption of Trawick's innocence, the burden the State had in overcoming this presumption, and the definition of "reasonable doubt" as a product of the jury's common sense and reason. We find no error in the court's definitions of the reasonable doubt standard and the State's burden of proof.
Trawick next argues that during the penalty phase of the trial the court failed to instruct the jurors as to how they were to weigh the aggravating and mitigating circumstances of Trawick's case. The trial court instructed the jury that, if it found that the mitigating circumstances outweighed the aggravating circumstances, it was required to recommend a sentence of life imprisonment without parole. However, Trawick points out that the trial court did not further instruct the jury that if the aggravating and mitigating circumstances were equally balanced, the jury was likewise required to recommend a sentence of life imprisonment. Trawick concludes that, because Alabama law requires that aggravating circumstances must outweigh mitigating circumstances in order for a jury to recommend the death sentence, the trial court's instructions misstated Alabama law and improperly created an inference that the jury was required to recommend the death penalty if it found that the circumstances were equally balanced.
Because Trawick did not raise this issue at trial, we must consider it in accordance with the plain error rule. We note that the jury instructions as to the weighing of aggravating circumstances and mitigating circumstances were materially the same as those set out in the Alabama Pattern JuryInstructions: Criminal for use in the sentencing stage of a capital murder trial in this state, and this Court has held that no reversible error will be found when the trial court follows the pattern jury instructions adopted by this Court.Kuenzel v. State, supra. The trial court correctly instructed the jury to recommend the death penalty only if it found that the aggravating circumstances outweighed the mitigating circumstances, obviously implying that in all other
circumstances the jury was required to recommend a sentence *Page 174 
of life imprisonment without parole. We do not agree with Trawick that this instruction could have misguided the jury as to its responsibility and function in weighing the aggravating and mitigating circumstances; on the contrary, the instruction clearly explained that the jury could recommend the death penalty under only one circumstance.Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), affirmed,603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925,113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). We therefore find no plain error in the instruction as given.
Trawick next argues that the trial court erred to reversal by failing to instruct that the jury, and not the trial court, was to make the ultimate decision regarding the voluntariness of Trawick's confession. After a pre-trial hearing on the voluntariness of the confession, the trial court ruled that it was admissible, and the confession then became central to the State's case against Trawick. Trawick contends that, by allowing the confession into evidence over his objection, the trial court implied to the jury that the confession was voluntary and proper. Trawick concludes that the trial court was required to instruct the jury that there was still an issue of fact as to the voluntariness of the confession, and he contends that its failure to do so was reversible error.
This Court has recognized that a trial court cannot lawfully prevent a jury from making a determination of voluntariness as affecting the weight and credibility to be given a defendant's statements. Ex parte Singleton,465 So.2d 443 (Ala. 1985). In Singleton, the trial judge specifically told the jury that he had already determined that the defendant's statement was voluntary and therefore admissible; however, the judge also clearly instructed that it was the jury that was to ultimately determine whether the confession was voluntary. This Court ruled that these comments did not imply that the jury should accept or believe the defendant's confession merely because it had been ruled admissible.
In this case, there is even less to indicate that the trial court in any way implied to the jury that Trawick's confession was voluntary merely because it was admissible. In admitting Trawick's confession into evidence, the trial court did not tell the jury that it had previously ruled upon the voluntariness of Trawick's confession. The trial court properly instructed the jury that the court would rule only as to whether evidence could be admitted into the case and that the jury would be the sole and exclusive judge of the truth of the evidence that was admitted. The trial court specifically stated that it did not get involved in the jury's "job" as the finder of fact. We find no plain error in the trial court's instruction.
 IV.
Trawick next argues that his confession to Gach's murder was elicited after he had requested an attorney and in response to improper promises made to him by the police; thus, he argues that the confession should have been suppressed at trial, relying on Edwards v. Arizona,451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 378 (1981).
To address these issues, we must note the following sequence of events from the record: Trawick gave several interviews to the Jefferson County Sheriff's Department personnel in October 1992. The first interview was not in direct relation to Gach's murder; rather, Trawick was brought in for questioning as part of the Department's investigation of several reported attempts by an unknown man to abduct women or to lure them into his vehicle. The police did not ask Trawick about Gach's murder, and no statements from the first interview were admitted at his trial.
In a second interview, on October 26, 1992, Lt. Steven S. Green specifically asked Trawick whether he had had any involvement in Gach's abduction and murder; however, Trawick did not admit guilt at that time. During that interview, Lt. Green asked Trawick if he would take a polygraph test; Trawick replied, in part, "[I]f I'm either being charged with or, you know highly suspected of a murder, I need to get legal assistance all the same." The interview stopped, although a police officer did ask *Page 175 
Trawick if he or his mother would object to a search of his residence.
A third interview occurred on October 29, 1992, after Lt. Green received a telephone call from Trawick's mother, who told him that Trawick wanted to speak with him. Lt. Green went to the jail and asked if Trawick wanted to see him. Lt. Green again advised Trawick of his Miranda rights; Trawick then stated that he understood those rights, and he signed a waiver form. Trawick gave an oral statement; he did not indicate that he wished to speak with an attorney before giving his statement.
During the third interview, Trawick told Lt. Green that he knew about Gach's murder and that he could tell Lt. Green what he needed to know to finish his investigation of the case. Trawick indicated that he wanted to minimize the publicity about the case, for his mother's sake, but that he wanted to make sure that the case would be tried as a capital murder and that he would be sentenced to death. Trawick did not ask to speak with an attorney. Lt. Green told Trawick that he would set up a meeting between Trawick and an assistant district attorney, and the interview ended.
A fourth interview occurred later that day, when Trawick met with Lt. Green and another police officer, along with Deputy District Attorney Roger Brown. After being advised of his Miranda rights, which he again waived, Trawick gave an oral statement, which was audiotaped, confessing to the abduction and murder of Stephanie Gach. While giving the statement, Trawick reiterated that he wanted the case to be tried as a capital murder and that he wanted the death penalty. Brown told Trawick that he would have to know the circumstances of the case before he could know whether Trawick could be tried for capital murder.
Trawick argues that, after he requested an attorney during the second interview, all questioning should have stopped until he was provided one. Thus, because he was not provided with an attorney before giving the oral statements in the third and fourth interview, he argues that evidence of those statements should have been suppressed.
When a suspect expresses a desire to deal with the police only through counsel, the suspect should not be subject to further interrogation by the authorities until counsel has been made available, unless the suspect himself initiates further communication, exchanges, or conversations with the police. Edwards v. Arizona, supra. The record shows that the second interview effectively ended after Lt. Green asked Trawick if he would take a polygraph test and Trawick indicated that he would want legal counsel before he would do so. According to Trawick's own testimony in the pre-trial suppression hearing, he asked his mother the next day to tell Lt. Green that he wanted to make a statement. When Lt. Green arrived at the jail, Trawick wanted to talk to him and, after being properly read his Miranda rights, he waived those rights and gave the statement. The evidence clearly shows that Trawick himself initiated further communication with Lt. Green, after indicating in the second interview that he might want legal counsel; thus, the statements that he gave in the third and fourth interviews were not given in violation of Edwards v.Arizona.
Trawick also argues that the assistant district attorney and the police promised him that, in return for his statement, they would assure that he would be expeditiously tried for capital murder, that he would be sentenced to death, and that they would keep news media coverage of the case to a minimum out of respect for Trawick's mother. He contends that he gave his statement only after he was promised that these conditions would be met, and that his statements were thus coerced, in violation of his due process rights.
At the pre-trial suppression hearing, Lt. Green confirmed that, before giving his statement at the fourth interview, Trawick told the distract attorney and police officers that he wanted to be tried for capital murder and to receive the death penalty. Lt. Green testified that Brown responded merely by saying that he would not know whether the case could be made capital until he knew the circumstances of it. Brown also testified that he only told Trawick, in effect, that he *Page 176 
did not know whether the case was a capital case because he did not know the facts. At the pre-trial hearing on his motion to suppress the confession, Trawick himself testified that Brown and the police officers only "promised that they would listen" to his statement and that if the facts they heard in the statement fit the facts necessary for a capital case, then his case would be tried as such.
The kinds of promises that may make a defendant's statement involuntary are promises of leniency, promises to bring the defendant's cooperation to the attention of the prosecutor, and the disclosure of incriminating evidence to the accused and silence in response to the defendant's offer to talk if his statement would not be used against him. Siebert v. State,562 So.2d 586 (Ala.Cr.App. 1989), affirmed, 562 So.2d 600
(Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398,112 L.Ed.2d 408 (1990). There is no evidence that the police or the deputy district attorney made any promises of this sort to Trawick. The deputy district attorney's mere promise to listen to Trawick's statement of the facts of the case and to then to take whatever action was appropriate under the law as applied to those facts was merely a promise that he would do his job; certainly, it was no special privilege or favor for Trawick.
The true test for determining whether extrajudicial confessions are voluntary is whether the defendant's will was overborne at the time he confessed so that the confession was not the product of a rational intellect and free will. Ex parteWeeks, 531 So.2d 643 (Ala. 1988). The evidence, including Trawick's own testimony, shows that Trawick himself initiated the contact that led to his confession, that he legitimately waived his right to an attorney before confessing, and that he did so without the inducement of special promises of the sort described in Siebert. We therefore find no merit in his argument that his confession was not voluntary.
Trawick next argues that, in sentencing him, the trial court improperly placed on him the burden of proving mitigating circumstances and erred in failing to find the existence of mitigating circumstances. He first points out that, under Ala. Code 1975, § 13A-5-45(g), a defendant has only the burden of interjecting the issue of mitigating circumstances, and the burden then shifts to the State to disprove the existence of the mitigating circumstances, by a preponderance of the evidence. He argues that the trial court improperly required him to prove the existence of mitigating circumstances, rather than requiring the State to disprove their existence.
In considering what Trawick offered as a mitigating circumstance — his contention that he had an impaired capacity to appreciate the criminality of this conduct or to conform his conduct to the requirements of law — the trial court stated:
 "[It] does not apply. Dr. Rosencrans finds that the defendant has serious characterologic and personality defects and paraphilia or sexual sadism to an extreme degree NOR [sic] Dr. Ronan's findings summarized at page 25 of her 28-page report nor do any of the other evidences (written or testimonial) persuade me that the defendant did not appreciate the wrongfulness of his actions or that his capacity to conform his conduct to the requirements of the law was substantially impaired."
(Emphasis added.)
Trawick argues that this indicates that the trial court placed the burden of persuasion upon him, rather than upon the State. We disagree. The trial court did not state that Trawick had failed to persuade it of the existence of the sixth statutory mitigating circumstance (set out at §13A-5-51); rather, it indicated that the evidence rebutted Trawick's contention regarding the mitigating circumstance and that it was therefore not persuaded to find the existence of that mitigating circumstance. Moreover, the record shows that the trial court properly instructed the jury as to the burden of proof on mitigating circumstances, and it is presumed to follow its own correct instructions. Ex parte Harrell,470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269,88 L.Ed.2d 276 (1985). We therefore find no *Page 177 
plain error in the trial court's finding as to this mitigating factor.
Trawick also claims that although the trial court did find a nonstatutory mitigating circumstance, based upon Trawick's "characterological defects," it should have found as a statutory mitigating circumstance that his capacity to appreciate the criminality of his actions was impaired. While the trial court was required by the United States Constitution to consider all the evidence Trawick presented in mitigation,Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973
(1978), it was not required to determine that mitigating circumstances existed. Ex parte Harrell, supra. The record contains sufficient evidence, presented by the various experts who testified at the guilt and sentencing stages of the trial, from which the trial court could conclude that, while Trawick may have suffered from a mental illness, his ability to appreciate the wrongfulness of his actions was not impaired by that illness. In view of this, we find that the trial court did not abuse its discretion in failing to find the existence of the sixth mitigating circumstance.
Trawick next argues that the trial court improperly failed to instruct the jury on the lesser included offense of noncapital intentional murder. He summarily states that the evidence presented at trial could have supported a finding that he killed Stephanie Gach before he placed her in his van; thus, he concludes, the jury could have believed that no kidnapping took place and could have convicted him of the noncapital charge of intentional murder.
Trawick did not request an instruction on intentional murder, nor did he challenge the lack of such a charge before the Court of Criminal Appeals or in his certiorari petition to this Court; thus, our review of this issue is for plain error only. A capital murder defendant is entitled to a charge on a lesser included offense only where there is a reasonable theory from the evidence that would support such a charge. Anderson v. State, 507 So.2d 580 (Ala.Cr.App. 1987). Trawick confessed that he first kidnapped, then murdered, his victim; this confession was properly admitted into evidence at trial. No reasonable interpretation of the evidence contained in the record would contradict Trawick's confession and support an inference that he killed Gach before he put her into his van; thus, there is no merit in Trawick's argument on this issue.
Trawick next argues that in regard to two pre-trial hearings he was improperly denied his constitutional right to be present. He points out that in Ex parte Jackson,674 So.2d 1365 (Ala. 1994), this Court held that state law and federal law secure the right of a defendant accused of a capital crime to be present during all stages of the trial. According to Trawick, he was excluded from two hearings wherein the parties outlined the case against him and discussed the admissibility of parts of his oral statements to the police. He therefore concludes that his conviction must be reversed and a new trial ordered, under Jackson.
In Jackson, the defendant was allowed to leave the courtroom twice during the sentencing portion of his trial, without having displayed a level of misconduct that would have constituted a forfeiture of his right to be present at the proceeding. This Court has not held, however, that a defendant has the right to be present at all pre-trial proceedings without regard to whether the defendant's absence will prejudice the defendant.
The record does not support Trawick's contention that he was denied the right to be present at a pre-trial hearing; rather, it shows merely that Trawick arrived late at one such proceeding and that, when he did arrive, the trial court fully apprised him of what had occurred in his absence. Trawick has not demonstrated how he was prejudiced by this, or how his presence at the entire proceeding might have changed the outcome of the trial. Because Trawick did not raise this issue before the trial court, the Court of Criminal Appeals, or before this Court in his certiorari petition, we review it only for plain error. We find none.
Trawick next argues that the trial court erred in admitting into evidence photographs of the victim and the crime *Page 178 
scene and autopsy slides. He argues that the admission of these pictures was unnecessary to the prosecution of the case and was meant only to inflame the jury and undermine his defense. Trawick did not raise this issue at trial or before the Court of Criminal Appeals, and he has not provided this Court with the exhibits at issue; there is therefore nothing in the record for this Court to review. We do note that the record indicates that the exhibits were properly authenticated and appear to have been introduced in order to establish evidentiary elements of the case. Photographs that show the wounds of a deceased victim are generally admissible as evidence even though the evidence is gruesome and cumulative and relates to undisputed matters. Ex parte Siebert,555 So.2d 780 (Ala. 1989), cert. denied, 497 U.S. 1032,110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). Moreover, it is within the trial court's discretion to determine whether such evidence should be admitted, Siebert, and we see nothing to indicate that the trial court abused its discretion in admitting the exhibits at issue.
Trawick next argues that the jury's general verdict recommending the death penalty improperly failed to specify which, if any, statutory aggravating circumstances were found. He points out that, because death is the ultimate punishment, the Eighth Amendment requires capital sentencing procedures that "minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. 153,96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). He also points out that statutory aggravating circumstances that genuinely narrow the class of persons eligible for the death sentence are the most important safeguards against the arbitrary infliction of capital punishment. Maynard v. Cartwright, 486 U.S. 356,108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and that the jury's finding of the statutory aggravating circumstances must be rationally reviewable. Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759,64 L.Ed.2d 398 (1980). He thus concludes that the jury should have been required to indicate in some fashion what criteria it relied upon in finding him eligible for the death sentence, and that its failure to do so is reversible error.
Because Trawick did not raise this issue before the trial court, the Court of Criminal Appeals, or before this Court in his petition for certiorari review, it will be reviewed only under the plain error rule. Beyond this, we note that there is no established Federal constitutional requirement or state law requirement that a jury specify the aggravating circumstances that it finds to exist. Haney v. State, supra.
The jurors in this case were properly instructed on the aggravating and mitigating circumstances and on the process to be used in weighing these circumstances. We therefore find no error in the jury's failure to specify the aggravating circumstances that it apparently found to exist.
Trawick next argues that the jury impermissibly "double-counted" the kidnapping charge against Trawick as both an element of the capital offense and as an aggravating circumstance. We have previously addressed this issue in other cases and have held that the fact that a particular capital offense necessarily includes one or more aggravating circumstances as specified in Ala. Code 1975, § 13A-5-49, shall not preclude the finding and consideration of that relevant circumstance or those circumstances in determining the sentence. Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert.denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985);Smith v. State, 698 So.2d 189 (Ala.Cr.App. 1996). Furthermore, Alabama courts have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense. Smith v.State, supra; Heath v. State, 455 So.2d 898 (Ala.Cr.App. 1983),affirmed, 455 So.2d 905 (Ala. 1984), affirmed, 474 U.S. 82,106 S.Ct. 433, 88 L.Ed.2d 387 (1985); Jenkins v. State,627 So.2d 1034 (Ala.Cr.App. 1992), affirmed, 627 So.2d 1054
(Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388,128 L.Ed.2d 63 (1994). We find no merit in Trawick's arguments as to this issue.
 V. Conclusion
This Court has reviewed the record and the briefs, considered the arguments made *Page 179 
before the Court on oral argument, and examined the writing and rulings of the Court of Criminal Appeals in regard to all the issues raised by Trawick, not just those specifically addressed above. Moreover, in compliance with Rule 39(k), Ala.R.App.P., we have searched the record of both the guilt phase and the sentencing phase of Trawick's trial for any plain error or defect that may have adversely affected his substantive rights. We find no error, "plain" or otherwise, that requires us to reverse the Court of Criminal Appeals' judgment affirming Trawick's conviction and sentence. That judgment is therefore affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, and COOK, JJ., concur.
* Note from the reporter decisions: In its opinion, the Alabama Court of Criminal Appeals spelled the victim's name "Gash."698 So.2d 151 Ala.Crim.App. 1995). Both the "Gach" and "Gash" spellings appear at various points in the record.