KELLUM, Judge.
Derek Tyler Horton was convicted of three counts of capital murder for the murder of Jeannette “Nettie” Romprey. The murder was made capital: (1) because it was committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975; (2) because it was committed during the course of an arson in the first degree, see § 13A-5-40(a)(9), Ala. Code 1975; and (3) because it was committed during the course of a burglary in the first degree, see § 13A-5-40(a)(4), Ala. Code 1975. By a vote of 10-2, the jury recommended that Horton be sentenced to death for his capital-murder convictions. The trial court followed the jury’s recommendation and sentenced Horton to death.

Facts

The evidence adduced at trial indicated the following. On Friday, April 9, 2010, Romprey visited her friend, Deborah Ann Niven. The two shopped that afternoon and Niven cooked dinner for Romprey that evening. Romprey left Niven’s house between 8:30 p.m. and 9:00 p.m. Niven testified that Romprey was “going straight home.” (R. 827.)
At approximately 1:30 a.m. on Saturday, April 10, 2010, the Grand Bay Volunteer Fire Department received a report of a fire at 14250-A Old Highway 90. When firefighters arrived at the scene, they found a double-wide mobile home engulfed in flames. The fire was “fully involved” and the roof of the mobile home had collapsed. (R. 830.) Firefighters worked for three hours to extinguish the blaze. Once the fire was out, firefighters discovered badly charred human and canine remains in the north corner of the mobile home, in what appeared to have been a bedroom. Through DNA testing, the human remains were determined to be those of Jeannette Romprey.
Dr. Eugene Hart, a medical examiner with the Alabama Department of Forensic Sciences (“DFS”), performed the autopsy on Romprey’s remains and also examined the canine remains that had been found in the mobile home. Dr. Hart testified that Romprey’s body had been badly burned in the fire and that her internal organs had been charred. Although all of Romprey’s body had been badly burned, Dr. Hart stated that the right side of Romprey’s body was more severely burned than her left side. The right side, Dr. Hart said, was so badly burned that all of Romprey’s *33 ribs on that side were missing. Romprey was also missing both of her forearms and hands. In contrast, Dr. Hart said, there was “some relative sparing of the skin on the left side of the body.” (R. 1155.) Dr. Hart stated that Romprey’s blood tested negative for carbon monoxide, which indicated that Romprey was already dead when the fire started. Dr. Hart testified that the cause of Romprey’s death was two gunshot wounds to the right side of her head. Both bullets, Dr, Hart said, followed a downward trajectory from the right side of Romprey’s head toward the left side, penetrating Romprey’s brain, and coming to rest near Romprey’s brain stem. Dr. Hart said that either bullet would have been sufficient, by itself, to cause Rom-prey’s death. Dr. Hart also stated that an X-ray of the canine remains found in the mobile home showed no bullets inside the dog’s body. However, Dr. Hart said that he could not determine if a bullet had passed through the dog.
Deputy State Fire Marshals Ken Smith and Michael Tally investigated the fire at Romprey’s mobile home. They examined the scene and what was left of the mobile home, contacted the company that had sold the mobile home to Romprey and that serviced the mobile home, and obtained weather reports for the time of the fire. Based on the fire patterns and the degree of destruction, Smith and Tally determined that the fire originated in the area where Romprey’s remains were found.[1] Weather reports indicated that there had been no inclement weather in the area at the time of the fire that could have caused the fire. An examination of debris at the scene and what little was left of the structure of the mobile home revealed no wiring or electrical problems, and it was determined that there had been no service calls for the mobile home, thus revealing no apparent accidental cause for the fire. The inability to find evidence of any accidental cause for the fire coupled with “the way the fire patterns were” led Smith and Tally to eliminate accident as a cause of the fire. (R. 881.) Smith and Tally also found no evidence of accelerants -or ignitable liquids at the scene. However, both testified that accelerants are often completely consumed by fire and leave no trace, and Tally stated that this would be particularly true with a mobile' home, which has a floor that is above ground. Smith and Tally also received information that Romprey had been shot twice, that her vehicle had been stolen, and that her mobile home had been burglarized. Absent an apparent accidental or weather-related cause, and given that Romprey had.been shot, Smith and Tally both opined that the fire had been intentionally set.
Jerry Hurst, a crime-scene investigator with the Mobile County Sheriffs Department, arrived at the scene of the fire between 5:30 a.m. and 6:00 a.m. the morning of April 10, 2010. He took numerous photographs of the mobile home. As he was preparing to leave, Inv. Hurst noticed a power cord on the ground near the edge of an embankment. When he walked over to collect the cord, he saw at .the bottom of the embankment numerous household items, including: two laptop computers; a desktop computer tower; a flat-screen television; several jewelry boxes with jewelry in them; a blue velvet tea-set box and *34 several pieces of a tea set scattered about; a woman’s wallet with Romprey’s Alabama driver’s license in it; and two watches. The items at the bottom of the embankment were collected and processed for fingerprints; no usable fingerprints were found on any of the items.[2] The items were identified at trial as belonging to Romprey.
Around 3:20 a.m. the morning of April 10, 2010, the Conecuh County Sheriffs Department began • receiving telephone calls from motorists reporting an automobile on the side of Interstate 65 northbound between mile markers 76 and 77 and reporting a - man walking along the interstate in the same vicinity. Between 3:20 a.m. and 6:50 a.m. that morning, the Conecuh County. Sheriffs Department received a total of five reports from, motorists, and it relayed the information from the reports to the Alabama Department of Public Safety, now a division of the Alabama Law Enforcement Agency. Chad Emmons, an investigator with the Conecuh County Sheriffs Department, testified that he later contacted the people who had telephoned the morning of April 10, 2010, obtained from them a description of the man they had seen walking along the interstate, and then relayed that description to the Mobile County Sheriffs Department. Inv. Emmons testified that he later went to a gasoline station at Exit 83 on Interstate 65 northbound and watched a surveillance video of the morning of Sunday, April 11, 2010, Inv, Emmons said that the video showed a man matching the description the motorists had provided; he stated that the man was Horton.
Around 8:00 a,m. the morning of April 10, 2010, Cameron Fillingim, a state trooper operating out of Evergreen, was notified of an abandoned automobile on Interstate 65 northbound near mile marker 76. Trooper Fillingim went to - the area and found a Chrysler PT Cruiser automobile “resting against a tree” in-a ditch off the interstate. (R. 901.) The vehicle had only “one very, very small dent on the front bumper” and no other body damage. (R. 901.) The keys were in the ignition, the ignition was on, and the vehicle was in drive, but the engine was not running. It was later determined that the vehicle was out of gasoline. Trooper Fillingim testified that there were clothes and jewelry in the vehicle. Trooper Fillingim notified his dispatcher to have a wrecker come tow the vehicle. A representative of Raap’s Towing arrived and towed the vehicle to Brew-ton. Trooper Fillingim testified that, in the process of towing the vehicle, both he and the tow-truck driver touched the steering wheel of the vehicle.
Corporal David Tunink, an investigator with the major crimes division of the Mobile County Sheriffs Department in 2010 and the lead investigator in this case, went to the scene of the fire on Old Highway 90 the morning of April 10, 2010. He noticed a two-story house at the rear of the property on which the mobile home sat. The garage door to the house was partially open, and a Toyota Camry automobile was parked in the garage. No one was in the house. Cpl. Tunink ran the license plate of the Toyota Camry and found that it was registered to Samantha Alspaugh, who was later determined to be Romprey’s daughter. Cpl. Tunink then entered Alspaugh’s information into a computer database known as “ALACOP” and found that Rom-prey resided on the same property as Als-paugh. This was the first indication to law enforcement as to the identity of the human remains in the mobile home which, as noted above, were later confirmed through *35 DNA testing to be those of Romprey. After finding Romprey’s name, Cpl. Tunink searched records and ' discovered that Romprey owned a Chrysler PT Cruiser automobile; that vehicle was not at the scene of the fire. After contacting Als-paugh’s husband, Romprey’s son-in-law,[3] and determining that the vehicle should have been at the mobile home, Cpl. Tunink entered the information regarding the PT Cruiser into the National Crime Information Center (“NCIC”) database as a stolen vehicle. Within 15 minutes, the state trooper post in Evergreen contacted Cpl. Tunink and informed him that the vehicle had been towed and was in Brewton.
John Gleaton, the chief investigator with the Escambia County Sheriffs Department in 2010, testified that he was told by his dispatcher the morning of April 10, 2010, to contact Cpl. Tunink with the Mobile County Sheriffs Department. Inv. Gleaton contacted Cpl. Tunink and was informed that a vehicle related to a murder investigation had been towed to Brew-ton by Raap’s Towing from the side of Interstate 65. Inv. Gleaton went to Raap’s Towing in Brewton where he met Trooper Fillingim and Robby Riddick, an investigator with the Mobile County Sheriffs Department. The officers secured the vehicle and waited for a wrecker from Mobile County to tow the vehicle to Mobile. Inv. Riddick verified through the vehicle identification number (“VIN”) that the PT Cruiser was registered to Romprey.
After the vehicle had been towed, Inv. Gleaton, Trooper Fillingim, and Inv. Rid-dick went to the area between mile markers 76 and 77 on Interstate 65 northbound to examine the scene where the vehicle had been found. Just south of where the vehicle had been found, they discovered on the side of the interstate two separate “debris fields.” (R. 926.) Each debris field included various items that “look[ed] like [they] belonged in the vehicle that [had been] towed.” (R. 908.) The debris fields contained items such as: an owner’s manual for a Chrysler PT Cruiser; various identification cards, documents, and paperwork containing Romprey’s name, including a checkbook; a photo album with what appeared to be family photos; Romprey’s notary seal; a personalized Alabama automobile license plate with the name “NETTIE”; a Montana automobile license plate and a Montana driver’s license in Rom-prey’s name;[4] an automobile 'ornament with the name “Nettie” on it; a pair of glasses; a set of keys; and various household items, such as a sack -with bedding in it, spray paint, an egg carton, and a package' of soft drinks. In one of the debris fields, law enforcement also found a silver Smith & Wesson five-shot revolver. Four of the cartridges in the revolver had been fired and one had not. Inv. Gleaton testified that the gun “looked like-it hadn’t been there for very long.” (R. 916.)
The items in the debris field were collected by law enforcement and processed for- fingerprints; no fingerprints were found on any of the items. Additionally, the revolver was swabbed and subsequent testing found no blood on the weapon. A partial DNA profile was found on one of the swabs from the' revolver, but “[t]he DNA was so weak” that it was not possible to do a comparison. (R. 1069.) A friend of Romprey’s testified that Romprey owned a revolver, and, when, he was shown the revolver that had been found on the side of the interstate, he stated: “I’m not a gambling man, but if I were to put money on it, I would say that, yes, this is Ms. Romprey’s sidearm.” (R. 1141.) Through *36 ballistics testing, it was later determined that the revolver was the murder weapon.
A few days later, Inv. Riddick went back to the area on Interstate 65 northbound where the debris fields had been found to “check the scene one more time.” (R. 929.) Just south of where the debris fields had been found, Inv. Riddick found what appeared to be a rearview mirror from a vehicle and a blue nylon bag with a white knit sock hat inside. The rearview mirror had no fingerprints on it. The white knit sock hat was later turned over to DFS for testing. Three spots on the hat tested positive for the presumptive presence of blood. Those spots, as well as a spot on the rim of the hat, were tested for DNA. All four spots contained Horton’s DNA. Romprey’s DNA was not found on the hat.
Romprey’s PT cruiser was also processed for both fingerprints and DNA. On the driver’s side door, Inv. Hurst found a partial palm print and two fingerprints. The partial palm print matched Horton’s palm print. The two fingerprints did not match Horton’s fingerprints, and Inv. Hurst was not able to match those prints to anyone else. A swab of the steering wheel was later found to contain a mixture of the DNA of at least two people. The mixture contained more of one person’s DNA than any other person, i.e., it contained “a major DNA profile.” (R. 1062.) The major DNA profile in the mixture matched Horton’s DNA. Romprey’s DNA was not in the mixture.
At approximately 7:30 a.m. on Sunday, April 11, 2010, James T. Morrow, a capítol police officer with the Alabama Department of Public Safety, was traveling northbound on Interstate 65 when he saw a man, whom he positively identified at trial as Horton, walking on the side of the interstate around mile marker 80 or 81. Officer Morrow pulled over to offer Horton assistance. Horton was wearing dark pants and a white sleeveless t-shirt, his clothes were wet and muddy, and he was barefoot. Officer Morrow did not remember seeing any cuts or bruises on Horton’s arms or legs. When asked why he was walking on the side of the interstate, Horton told Officer Morrow that he had been traveling with a friend from Pensacola, Florida, to Huntsville, Alabama, and that the two had gotten into an altercation Friday night near Brewton. Horton said that his friend drove off and left him. Horton told Officer Morrow that he had crossed the highway on which the two had been traveling[5] and began walking through a swamp toward Interstate 65. When he reached Interstate 65, Horton told Officer Morrow, he continued walking northbound. Officer Morrow confirmed that there were swamps in the area near Brewton. According to Officer Morrow, Horton said that he had lost his shoes and his wallet in the swamp. Officer Morrow testified that he told Horton that his statement about walking from the highway near Brewton through a swamp to get to Interstate 65 “didn’t make any sense” when Horton could have stayed on the highway on which he and his friend had been traveling to get to Huntsville, and Horton “got offended by that a little bit” and “kind of shut down” after that, making it difficult to communicate with him. (R. 963.)
Nonetheless, Officer Morrow was able to learn from Horton that he was from the Mobile area, and Officer Morrow attempted to help Horton obtain shoes and dry clothing and a way to get home to Mobile. According to Officer Morrow, Horton was initially adamant about going to Huntsville, but he later allowed Officer Morrow to assist him in finding a way home to the Mobile area. Officer Morrow drove Hor *37 ton to three different exits on Interstate 65 northbound—exits 83, 93, and 97—in an attempt to find Horton assistance. Finally, at what was then known as the McIntyre Travel Center at exit 97 near Evergreen on Interstate 65, Officer Morrow was able to find assistance for Horton. Various customers and employees at the travel center provided Horton with dry clothes and shoes, fed Horton, and gave Horton access to the showers at the center. A pair of wet and muddy pants were later found in a trash can in shower room number 2 at the travel center. The pants later tested positive for the presumptive presence of blood. DNA testing revealed that the blood was Horton’s. Romprey’s DNA was not found on the pants. Testimony indicated that the shower room was processed for fingerprints, but no testimony was presented as to whether any fingerprints were found.
After arriving at the travel center, Officer Morrow telephoned Horton’s girlfriend and grandmother and left messages for them. According to Officer Morrow, when Horton’s grandmother returned Officer Morrow’s telephone call, she told Officer Morrow that she would be there to pick up Horton in about two hours. Officer Morrow testified that he was concerned about leaving Horton alone at the center with the two female employees so he asked Horton’s grandmother whether Horton had any mental issues, whether he was on medication, or whether he was violent. Officer Morrow testified that his conversation with Horton’s grandmother revealed no indication that Horton was violent. Officer Morrow questioned Horton’s grandmother not because Horton acted violent or appeared mentally ill but solely because of the circumstances of finding Horton on the interstate and Horton’s disheveled appearance. He said that Horton was coherent, calm, courteous, and appreciative of his help, and he described Horton as “perfectly normal.” (R. 968.)
Shandra Dooley, an employee of Max Oil Company in Evergreen, formerly known as the McIntyre Travel Center, testified that around 8:00 a.m. on April 11, 2010, a law-enforcement officer stopped by with a young man and asked if the man could stay there until his grandmother picked him up. At trial, Dooley positively identified the man as Horton. At the time, Horton was dirty, his feet were muddy, and he was not wearing shoes. Dooley did not recall seeing any scratches or marks on Horton. Dooley said that a customer of the center went home and got Horton clean clothes and shoes, that she allowed Horton to use the showers at the center, and that her coworker bought Horton breakfast. Dooley said that Horton stayed in the lounge area of the travel center until his grandmother picked him up between 12:00 p.m. and 1:00 p.m. that day. Dooley initially testified that she did not recall any concern about Horton’s mental state at the time, but she then stated that she did recall a conversation about Horton’s taking medication and that there was some concern about Horton possibly having mental issues.
The State presented testimony that Horton went to St. John the Baptist Catholic Church in Grand Bay at approximately 8:00 p.m. the night of April 9, 2010. Testimony indicated that the church was approximately 10 miles from Horton’s house in Theodore, where he lived with his mother and sister, and approximately 3 miles from Romprey’s mobile home in Grand Bay. Katherine Courtney Pritchard Comer testified that she was chaperoning a youth group at the church the night of April 9, 2010, when a young man came to the church. The man was wearing dark pants, a white shirt, and a white hat. Comer said that the man seemed “unsettled” and *38 “something made [her] feel like he was maybe a threat and made [her] feel like [she] wasn’t safe.” (R. 983.) Comer testified that when she asked the man what he was doing, he said he was looking for the pastor. Comer told the man that the priest was not there, but informed him that he could leave his name and telephone number and the priest would contact him. The man wrote his name—“Derek Horton”—and telephone number on a piece of paper and Comer then wrote on the paper “Friday 8:00 p.m.,” “Father Wall please call” and “He wants to become catholic.” (State’s Exhibit 184.) Comer said that she assumed the man wanted to become catholic because he had said that he wanted to join the church and she had told him that it was a catholic church.
Nick Switzer, a member of the youth group at St. John the Baptist Catholic Church in Grand Bay, testified that he remembered a young man coming to the church the night of April 9, 2010. Switzer said that the man was wearing a “skull cap” and looked “sad [and] depressed.” (R. 987.) Switzer said that the man wrote something on a piece of paper and then left. Switzer positively identified Horton at trial as the man he had seen at church the night of April 9, 2010. Additionally, Switzer was shown the white knit sock cap that had been found on the side of Interstate 65, and was asked if it appeared to be the type of cap Horton had been wearing that night; Switzer answered in the affirmative.
The State also introduced into evidence a surveillance video from Country Breeze Number 6, a Chevron gasoline station and convenience store on Old Highway 90. Testimony indicated that the convenience store was approximately one and a half miles from St. John the Baptist Catholic Church and one and a half miles from Romprey’s mobile home. The video was taken by a camera on the outside of the front of the store facing the gasoline pumps. Within the camera’s field of view are five parking spaces at the front of the store and three gasoline pumps. The video shows a person wearing a white short-sleeve t-shirt and white cap—similar to the clothing Horton was described as wearing when he went to St. John the Baptist Catholic Church—walk from outside the field of view of the surveillance camera from right to left and sit on what appears to be the curb at the front of one of the parking spaces. The person stays seated on the curb for approximately 18 minutes and then gets up and walks to the right, out of the field of view of the camera. The time stamp on the video indicates that the person entered the camera’s view at approximately 7:04 p.m. and left at approximately 7:22 p.m. However, testimony at trial indicated that the time stamp may have been incorrect by approximately one hour as a result of daylight savings time, i.e., that the time the video was taken was actually 8:04 p.m., not 7:04 p.m. Sarah Michelle Adams, Horton’s girlfriend at the time of the crime, was shown the video during her testimony at trial, and she positively identified Horton as the person in the video.
Adams testified on direct examination that she and Horton had been dating for about a year before the crime occurred. Adams said that her relationship with Horton was “perfect” until about four to four and a half weeks before Romprey’s murder, at which point, she said, Horton began acting strangely. (R. 1072.) Adams stated that approximately four to four and a half weeks before the murder, Horton and a friend had borrowed another friend’s truck and left for the evening. When Horton came home, he told Adams that he and his friend had used cocaine, and his friend had then driven away in the truck and left Horton on the road. Adams said that *39 Horton did not normally use cocaine and that it was “[r]ight after” that incident that Horton began behaving strangely. (R. 1077.) On redirect examination, Adams stated that she thought that the cocaine Horton had used may have been “cut” with something that altered his behavior. (R. 1096.)
Adams described Horton’s strange behavior in the weeks leading up to the murder and in the days following the murder as follows: She stated that Horton began “[t]alking out of his head. Talking about God, and a bunch of different things that didn’t make sense.” (R. 1073.) Adams testified that Horton “threatened a lot. Threatened me, threatened different things that he said. He talked to the mirrors, to the devil, talking to the devil, stomping around.” (R. 1073.) When asked how he had threatened her, Adams said that Horton “slammed [her] up against the fence because [she] didn’t pray like he wanted [her] to pray [and h]e choked [her] up against the fence.” (R. 1074.) Adams said that she “blacked out” when Horton choked her. (R. 1074.) Adams did not state on direct examination when this incident occurred. When asked if Horton had threatened anyone else, Adams testified:
“He told me that if nobody does right that he was sent here to send judgment. God had a mission for him to send judgment if we didn’t pray right. They were—it was his—God called him to deliver it. In other words, they would be hurt he was trying to tell me.... If they did any kind of wrong. Me, his mom, or his sister.... ”
(R. 1074.)[6]
Adams testified that on Friday, April 9, 2010, she had planned to visit Horton at his house where he lived with his mother and sister, but that when she telephoned his mother around noon that day, his mother informed her that Horton was not home. Adams said that no one knew where Horton was and that she did not see or hear from Horton until Sunday, April 11, 2010. Adams stated that on April 11, 2010, Horton’s mother contacted her and asked her to return a long-distance telephone call from Horton because she could not dial a long-distance number on her telephone. Adams telephoned the number and spoke with Horton. Adams said that Horton asked her not to tell his mother where he was and that he “[w]anted [her] to send him some money so he could get away.” (R. 1078.) Despite Horton’s request, as soon as she finished speaking with Horton, Adams contacted Horton’s mother and told her that Horton was at the travel center in Evergreen. Adams said that Horton’s grandmother drove to Evergreen and picked up Horton that day.
Adams testified that when Horton returned home on Sunday, April 11, 2010, she visited him and asked him how he had gotten to Evergreen. According to Adams, Horton “said that he got a car out of nowhere. God had him on a mission. He walked through swamps. Angels carried him part of the way.” (R. 1079.) Adams further stated that Horton told her that God had given him the car and that when the car had run out of gas on the interstate, the “angels ... carried him” and “he went through the swamps.” (R. 1080.) Adams testified that the next day, on Monday, April 12, 2010, Horton built a fire in a fire pit in his backyard, “burnt stuff in the fire, and made [her] read out of the Bible for about four hours by the fire.” (R. 1080.) When shown a picture of a fire *40 pit in the backyard of Horton’s house, Adams identified it as the place where Horton had built the fire. When shown a picture of another burned area of grass in the backyard closer to the house, Adams indicated that she had never seen a fire in that area. According to Adams, the following day, on Tuesday, April 13, 2010, as he was leaving to go to church, Horton told her that “if the fire was not—the log on the fire was not burned out, he was going to put [her] in the fire.” (R. 1080.) However, that evening, Adams said, Horton “forgot about the log” and acted more like himself. (R. 1081.) Adams testified that a few days later, Horton was placed in the Mobile County Metro Jail.
On cross-examination, Adams testified that when she first noticed a change in Horton’s behavior sometime in March 2010, Horton talked about the movie Scar-face and “talk[ed] about stomping on cockroaches.” (R. 1086.) Adams initially testified that the first time Horton began talking about praying was the last time she had seen him before the murder. Adams said that the last time she had seen Horton before the murder was at his house, which she said was “[m]aybe a week before” the murder. (R. 1089.) However, Adams then said that Horton talked about praying while she and Horton, and Horton’s sister, were staying at the Red Roof Inn motel at some unidentified point in time before the murder. According to Adams, at the motel she heard Horton “stomping around in the bathroom, talking to the devil in the mirror.” (R. 1087.) However, Adams could not recall what Horton had said. Adams testified that, while they were staying at the motel, Horton also “blanked back and forth. He would be himself, and he’d start crying, asking for help for—we all pray with him. And then he’d switch over, start talking about he wanted a gun and wanted to be like Scarface and stomp on cockroaches.” (R. 1091.) Adams testified that the last time she saw Horton at his house before the murder, Horton “made us all get down on our knees and pray.” (R. 1089.) Adams said that by “us,” she was referring to herself, Horton’s sister, a friend of Horton’s sister, and Horton’s mother. Adams stated that at that time, Horton was “demanding” and “[tjhreatening.” (R. 1090.)
Adams testified that when she saw Horton on Sunday, April 11, 2010, he was not acting strangely, but “was mainly just tired.” (R. 1093.) Adams said that it was the next day, Monday, April 12, 2010, when Horton built the fire in the fire pit in his backyard that he was again acting strangely. It was then, Adams said, that Horton choked her until she blacked out. Adams described the incident:
“[He m]ade me get down and pray. And I was praying. And he said I wasn’t being sincei’e. And I was. I was bawling. I was praying all that I could. And he grabbed me by my throat, just like I said earlier, and slammed me against the fence. And that’s all I remember. I woke up on the ground.”
(R. 1093.) Adams said that Horton burned clothing, books, pictures, and “stuff out of the kitchen” in the fire pit, and that Horton told her that the items were “[e]vil things” and that “[h]e had made a sacrifice” to God. (R. 1094.)
Adams testified that Horton’s behavior in the weeks leading up to the murder was out of character and that he had never acted in that manner in the year she had been dating him. Adams said that during her year-long relationship with him, Horton was kind and friendly and got along with people. Adams also stated that she had told people that she thought Horton had lost his mind and that she went to court with Horton’s family and testified in an attempt to have Horton committed.
*41 On Wednesday, April 14, 2010, Charles Nathaniel Bailey, Jr., a crime-scene investigator with the Mobile County Sheriffs Department, took photographs of Horton. The photographs show numerous scratches on Horton’s arms and legs as well as three wounds on his hands that appear to be burns. The next day, on Thursday, April 15, Inv. Bailey went to Horton’s house in Theodore. In the backyard, Inv. Bailey found a small burned area in the grass fairly close to the back of the house. Inv. Bailey said that the burned area did not appear to have been there long. In the burned area, Inv. Bailey found a zipper, a plug-in charger possibly for a cellular telephone, earphones, four pennies, a butter knife, a small electronic device, a button, nail clippers, burned clothing fragments, and what appeared to be a chip from a SIM card. Additionally, Inv. Bailey found a fire pit in the backyard, farther away from the back of the house than was the burned area. Inv. Bailey collected a jacket from Horton’s house. The jacket tested positive for the presumptive presence of blood. However, DNA testing revealed that the blood was not Romprey’s.
On Thursday, April 15, 2010, Cpl. Tun-ink interviewed Horton at the Mobile County Sheriffs Department administration building. Cpl. Tunink testified that he advised Horton of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that Horton voluntarily waived his rights and spoke to him. The interview was recorded and played for the jury; a transcript of the interview was also prepared and introduced into evidence as State’s Exhibit 181.[7] Additionally, during the interview, Horton handwrote an approximately two- and-a-half page statement that was introduced into evidence as State’s Exhibit 190. During the interview, Cpl. Tunink did not mention Romprey’s murder or directly question Horton about the murder. Rather, Cpl. Tunink asked generalized questions about Horton’s background and the events of the previous week. At certain points, Cpl. Tunink did attempt to clarify Horton’s answers with more specific questioning, such as questioning Horton about the vehicle he had traveled in the previous weekend and whether Horton had seen a fire, but at no point did Cpl. Tunink specifically mention Romprey’s murder.
Cpl. Tunink began the interview by asking general questions regarding Horton’s background. Horton indicated that he lived with his grandmother for part of his life because his mother was a drug addict but that, when he was about 13 or 14 years old, he moved in with his mother because she got sober. Cpl. Tunink also asked Horton about his movements over the previous week. Horton stated that he did not remember much of what had happened over the past couple of months, that he only “remember[ed] flashes” and everything was “just a blur.”[8] When asked about the flashes of memory, Horton said that he remembered running in the woods from his mother’s house and arguing a lot with his mother. He also said that every *42 body thought he was acting crazy, but that “pitbulls and things started coming out of nowhere and you know, just a lot of evil, lot of evil things started happening and uh, once, once I started you know ... I don’t know, I just turned back to God.” Horton stated that he remembered running in the woods in Evergreen on Sunday; he said that he thought somebody had given him a ride to Evergreen. When asked specifically how he got to Evergreen, Horton said that he had gotten a ride from someone, but when asked to describe the person, Horton said it was three different people and “it was like angels.” Horton was unable to describe anyone who had given him a ride, other than “a State Trooper up north.” When asked how he had ended up in the woods, Horton said that he had been “following the good voices.” Horton also said that before he ended up in the woods, “everything evil was trying to come into [his] house” and he was “trying to get everybody to pray” and then the police came to his house. Horton said that no one wanted to pray with him so he “just ran.” When asked what he saw before the angels took him to Evergreen, Horton said “I remember a lot of blackness and then I remember white.” Horton said that he “had no idea” if the white was fire. Horton also said that he remembered that on Good Friday he had seen a friend who had told Horton that he “was on the run for something.”[9]
Horton also said that he remembered being in a motel room a month or two months before the interview and that “all [he] could talk about was steal, kill, rob and destroy[, he] saw Scarf ace and this and that cause [he] just—that was just cause [he] was just so hurt ,.. about all the things that happened in [his] life.” Specifically, Horton stated that his “sister was all acting crazy and running the streets and [he] heard she was smoking crack [and] that’s what started it.” Horton stated that he knew that his sister used marijuana because he used marijuana with her “plenty,” but that he feared for her safety when she began using crack cocaine. Horton stated that he had gone to the motel with his sister to “get away” after he, his mother, and his sister had gotten into an argument. Horton said that during the argument with his mother, his mother got a kitchen knife and that he then choked her. Horton stated that his mother had been in prison and “ain’t nothing to play with,” so he had to “manhandle” and “overpower” her. Horton said that while in the motel room, “they was saying I did some bad coke or something, but I didn’t do nothing I was just uh, losing my mind.” Horton claimed that he thought he was going to have to go to a mental institution, but he then “got down on [his] knees and prayed to God” and “after that everything started feeling better.”
In his written statement, Horton provided a history of his education and stated that he did not know what had happened over the last seven days. Horton wrote that living with his mother was like a “war zone” because he and his mother fought “all the time,” both verbally and physically. (State’s Exhibit 190.) Horton wrote that his mother and sister were both drug addicts and that he felt the need to take care of them. At one point, Horton said, he tried to “get rich quick” by “selling drugs” and “hustling,” but that it did not work out. (State’s Exhibit 190.) Horton also wrote that he had lost his mind.
*43 Cpl. Tunink testified that, at the time of the interview, Horton was wearing jail clothes but that he was not in jail for the murder. On cross-examination, Cpl. Tun-ink testified that the day after the interview, he learned that Horton’s mother had filed a petition to have Horton involuntarily committed because she was concerned about Horton’s mental well being. Cpl. Tunink stated that he had attended the commitment hearing and that he had testified at the hearing that he believed that Horton may be mentally ill and needed to be evaluated. Cpl. Tunink also said that he had testified at the commitment hearing that he had knowledge of “prior difficulties” between Horton and his mother and that law enforcement had previously been summoned to the Horton residence. (R. 1118.) On redirect examination, Cpl. Tunink testified that as a result of the commitment hearing, Horton was ordered to BayPointe Hospital for a mental evaluation. Cpl. Tunink also testified on redirect examination that the reason law enforcement had been called to the Horton residence was a domestic-violence complaint against Horton by his mother. On recross examination, Cpl. Tunink testified that Horton was arrested for Romprey’s murder on April 26, 2010.
The State also introduced into evidence audio recordings of three telephone calls Horton had made to Adams from jail on April 20, 2010, and April 22, 2010, respectively. In the first telephone call, made at 7:52 p.m. on April 20, 2010, Horton told Adams that he was in the metro jail; when Adams asked what had happened, Horton told her that he had escaped from Bay-Pointe Hospital. Horton described the numerous people who had helped him after his escape and his plan to work for awhile and then to return to face the charges against him,[10] but he said that his aunt had “snitched” on him while he was asleep and he was arrested. Horton told Adams that he did not know how long he would be in jail and he asked Adams to give him $20 or $30 so that he could pay for telephone calls. When asked how he paid for this telephone call, Horton told Adams that he was at “intake.” Horton also told Adams that all he had to do was complete his evaluation at BayPointe Hospital and he would be released. However, Horton then told Adams that the only reason he was in jail was because the police wanted to question him about “that murder,” but he said that the police would not find anything linking him to the murder.
In the second telephone call, made at 7:01 p.m. on April 22, 2010, Horton asked Adams to pay his $500 cash bond so that he could be released from jail. Adams said that she and Horton’s mother had tried to bail him out of jail previously but that they could not because he had to return to BayPointe Hospital. Horton told Adams that he no longer had to return to BayPointe Hospital, that he did not trust his mother, and that he believed that the only reason he was in jail was because of his mother. Horton complained about being in jail so long, and told Adams that he was miserable and had been in solitary confinement the entire time he had been there. Adams told Horton that he would not still be in jail if he had not escaped. Horton also said during this call that he was “on the run” from a murder charge and that he had no one who would help him.
In the third telephone call, made at 7:14 p.m. on April 22, 2010, Horton again asked Adams to pay his cash bond so that he could be released from jail. Adams told Horton that she did not have the money and that she needed to work for a few *44 days to earn the money to pay his bond. Horton said that waiting a few days was not acceptable because he was going to be released on May 5, 2010, anyway, and he wanted out of jail immediately. Horton threatened that when he got out of jail on his own he would shoot everyone who had not helped him and burn their houses down. Horton specifically mentioned his mother and Adams when making the threat.

Standard of Review

Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001). Plain error is “error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.” Ex parte Trawick, 698 So.2d 162, 167 (Ala.1997), modified on other grounds, Ex parte Wood, 715 So.2d 819 (Ala.1998). “Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.” Wilson v. State, 142 So.3d 732, 751 (Ala.Crim.App.2010). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). “‘The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.’” Ex parte Walker, 972 So.2d 737, 742 (Ala.2007) (quoting Ex parte Trawick, 698 So.2d 162, 167 (Ala.1997)). Thus, “‘[t]he plain error exception to the contemporaneous objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).

Analysis

On appeal, Horton raises numerous issues for our review. However, because of our disposition of this case, we address only two of those issues: (1) whether the trial court erred in admitting evidence of Horton’s collateral acts under Rule 404(b), Ala. R. Evid., and (2) whether the trial court erred in admitting the surveillance video from Country Breeze No. 6, the gasoline station and convenience store approximately one and a half miles from Rom-prey’s mobile home. Although Horton filed a pretrial motion in limine to prohibit the State from presenting evidence of some of his collateral acts under Rule 404(b), Horton did not receive an adverse ruling on the motion, nor did he object when the State offered the evidence of his collateral acts at trial. Horton also did not object when the State offered the surveillance video at trial. Therefore, we review these claims under the plain-error rule.
I.
 First, Horton contends that the trial court erred in allowing the State to *45 present evidence of collateral acts under Rule 404(b), Ala. R. Evid.
‘“The admission or exclusion of evidence is a matter within the sound discretion of the trial court.’ Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte hoggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-bad-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). See also Irvin v. State, 940 So.2d 331, 344-46 (Ala.Crim.App.2005).”
Windsor v. State, 110 So.3d 876, 880 (Ala.Crim.App.2012).
Generally, “[e]vidence of any offense other than that specifically charged is prima facie inadmissible.” Bush v. State, 695 So.2d 70, 85 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997). “[T]he exclusionary rule prevents the State from using evidence of a defendant’s prior [or subsequent] bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial.” Ex parte Drinkard, 111 So.2d 295, 302 (Ala.2000). “[T]he purpose of the rule is to protect the defendant’s right to a fair trial by preventing convictions based on the jury’s belief that the defendant is a ‘bad’ person or one prone to commit criminal acts.” Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985). “‘The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ ” Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983) (quoting C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (3d ed.1977)).
However, “[t]he State is not prohibited from ever presenting evidence of a defendant’s prior [or subsequent] bad acts.” Moore v. State, 49 So.3d 228, 232 (Ala.Crim.App.2009). “[Evidence of collateral crimes or bad acts is admissible as part of the prosecutor’s case if the defendant’s collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty of the charged offense because of his past misdeeds.” Bush, 695 So.2d at 85.
“‘In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it.’ ”
Bradley v. State, 577 So.2d 541, 547 (Ala.Crim.App.1990) (quoting Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942)). Rule 404(b), Ala. R. Evid., provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of *46 any such evidence it intends to introduce at trial.”
“ ‘Rule 404(b) is a principle of limited admissibility. This means that the offered evidence is inadmissible for one broad, impermissible purpose, but is admissible for one or more other limited purposes.’” Taylor v. State, 808 So.2d 1148, 1165 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001) (quoting C. Gamble, McElroy’s Alabama Evidence § 69.01 (5th ed.1996)). Moreover:
“Rule 404(b) is a test of relevancy. Rule 401, Ala. R. Evid., defines ‘relevant evidence’ as ‘evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.’ As this Court noted in Hayes v. State, 717 So.2d 30 (Ala.Crim.App.1997): ‘Alabama recognizes a liberal test of relevancy, which states that evidence is admissible “if it has any tendency to lead in logic to make the existence of the fact for which it is offered more or less probable than it would be without the evidence.” ’ 717 So.2d at 36, quoting C. Gamble, [McElroy’s] Alabama Evidence § 401(b). ‘[A] fact is admissible against a relevancy challenge if it has any probative value, however[] slight, upon a matter in the case.’ Knotts v. State, 686 So.2d 431, 468 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996).”
Draper v. State, 886 So.2d 105, 119 (Ala.Crim.App.2002). Because the question of the admissibility of collateral-act evidence is whether the evidence is relevant for a limited purpose other than bad character, “the list of traditionally recognized exceptions [to the exclusionary rule] is not exhaustive and fixed.” Bradley, 577 So.2d at 547. However,
“[t]he State has no absolute right to use evidence of prior acts to prove the elements of an offense or to buttress inferences created by other evidence. Evidence of prior bad acts of a criminal defendant is presumptively prejudicial. It interjects a collateral issue into the case which may divert the minds of the jury from the main issue.”
Ex parte Gofer, 440 So.2d at 1124. Therefore, “[f]or collateral-act evidence to be admissible for one of the ‘other purposes’ in Rule 404(b), there must be a “ ‘real and open issue as to one or more of those ‘other purposes.’ ” ”” Draper, 886 So.2d at 117 (quoting Gillespie v. State, 549 So.2d 640, 645 (Ala.Crim.App.1989), quoting in turn, Bowden v. State, 538 So.2d 1226, 1227 (Ala.1988)). When the question of the admissibility of collateral-acts evidence is “extremely close, we conclude that any doubt about the admissibility of the testimony should, given the highly prejudicial nature of the evidence, be resolved in favor of the accused.” Brewer v. State, 440 So.2d 1155, 1158 (Ala.Crim.App.1983).
Furthermore, “even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant’s character, it should be excluded if ‘it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury,’ ... or put another way, ‘unless its probative value is “substantially outweighed by its undue prejudice.” ’ ” Bradley, 577 So.2d at 547-48 (citations omitted). “Before its probative value will be held to outweigh its potential prejudicial effect, the evidence of a collateral crime must not only be relevant, it must also be reasonably necessary to the state’s case, and it must be plain and conclusive.” Bush, 695 So.2d at 85. See also Thompson v. State, 153 So.3d 84, 136 (Ala.Crim.App.2012) (“The [Alabama Supreme] Court [has] cautioned that Rule 404(b) evidence must be ‘reasonably necessary to *47 [the State’s] case.’ [Ex parte Jackson,] 33 So.3d [1279,] 1286 [ (Ala.2009) ].”).
As this Court explained in Woodard v. State, 846 So.2d 1102 (Ala.Crim.App.2002):
“Evidence of collateral crimes is ‘presumptively prejudicial because it could cause the jury to infer that, because the defendant has committed crimes in the past, it is more likely that he committed the particular crime with which he is charged—thus, it draws the jurors’ minds away from the main issue.’ Ex parte Drinkard, 777 So.2d 295, 296 (Ala.2000). In Robinson v. State, 528 So.2d 343 (Ala.Crim.App.1986), this Court explained the exclusionary rule as follows:
“ ‘ “ ‘On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.’ ” Pope v. State, 365 So.2d 369, 371 (Ala.Cr.App.1978), quoting C. Gamble, McElroy’s Alabama Evidence § 69.01 (3d ed.1977). “ ‘This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’” Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting McElroy’s supra, § 69.01(1). Thus, the exclusionary rule serves to protect the defendant’s right to a fair trial. “‘The jury’s determination of guilt or innocence should be based on evidence relevant to the crime charged.’ ” Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983); Terrell v. State, 397 So.2d 232, 234 (Ala.Cr.App.1981), cert. denied, 397 So.2d 235 (Ala.1981); United States v. Turquitt, 557 F.2d 464, 468 (5th Cir.1977).
“ ‘ “If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.” Saffold v. State, 494 So.2d 164 (Ala.Cr.App.1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App.1984); Scott v. State, 353 So.2d 36 (Ala.Cr.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. “‘Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be *48 reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.’ ” Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985), quoting United States v. Turquitt, supra at 468-69. “ ‘ “Prejudicial” is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.’ [Citation omitted.] ‘Of course, “prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.” ’ ” Averette v. State, supra, at 1374.’
“528 So.2d at 347.”
846 So.2d at 1106-07.
At trial, the State presented the following collateral-act evidence: (1) that Horton had used cocaine once approximately a month before the murder, that he had often used marijuana with his sister, and that at one point in his life he had sold drugs to make money; (2) that the Monday after the murder, Horton assaulted his girlfriend by throwing her up against a fence and choking her until she lost consciousness because she was not praying properly and the following day he threatened to throw her into a fire; (3) that at some point in the month before the murder, Horton assaulted his mother by choking her, had frequent physical altercations with his mother, and was in jail for an unrelated criminal charge when he was interviewed by police;[11] (4) that Horton escaped from BayPointe Hospital after he had been ordered there for a mental evaluation; and (5) that while in jail Horton threatened to shoot anyone who had not helped him get out of jail and then burn their houses down.
In the trial court, the State argued that evidence that Horton had used cocaine approximately one month before the crime was admissible to rebut Horton’s plea of not guilty by reason of mental disease or defect and to establish that Horton’s strange and ultra-religious behavior in the weeks leading up to the murder was not the result of a mental disease or defect but was drug-induced. The State also argued that, even if Horton had not asserted insanity, evidence of his cocaine use was admissible because, the State argued, it was “woven into the very fabric of the case” (R. 146) and was “part of the very fiber of the case in terms of what was going on and why it was going on,” i.e., that it was part of the res gestae of the *49 murder and established a motive for the murder. (R. 148.) The State asserted that Horton’s behavior in the weeks leading up to the murder was “so bizarre” that the jury would “be left in a state of total befuddlement” if there was not an explanation, i.e., his use of cocaine, as to why he had suddenly begun acting strangely when he had never acted strangely at any other time in his life. (R. 149.)
The State also argued at the hearing that evidence of Horton’s assault on his mother, his assault on Adams and his threat to throw Adams in the fire pit, his escape from BayPointe Hospital, and his threat to shoot people and bum their houses down was also admissible as “part of the entire scenario,” i.e., the res gestae of the murder, and was admissible to establish “his mental state” and motive for the murder. (R. 152.) The State asserted that all of these acts occurred during the same period as the murder, a period during which Horton was behaving strangely. The State further pointed out that Horton’s threat to throw Adams into a fire he had built in a fire pit and his later threat to shoot people and burn their houses down were similar to the circumstances of Romprey’s death and, thus, relevant. On appeal, the State further argues that all the collateral-acts evidence was admissible to show Horton’s intent.
A.
We hold that evidence that Horton escaped from BayPointe Hospital and that he threatened to shoot people and burn their houses down was admissible.
Evidence that Horton escaped from BayPointe Hospital was relevant to show consciousness of guilt. Consciousness of guilt can be inferred from an accused’s escape from custody. See, e.g., Centobie v. State, 861 So.2d 1111, 1122-24 (Ala.Crim.App.2001); Brown v. State, 821 So.2d 219, 225 (Ala.Crim.App.2000); Sartin v. State, 615 So.2d 135, 137 (Ala.Crim. App.1992); and Crittenden v. State, 414 So.2d 476, 480 (Ala.Crim.App.1982). In Brown, this Court explained:
“ ‘Any conduct or declaration of a person having relation to the offense he is suspected of or charged with, indicating a consciousness of guilt, is admissible evidence against him.’ Sparks v. State, 376 So.2d 834, 843 (Ala.Crim.App.1979). ‘The flight of the accused is admissible whether it occurred before or after his arrest.’ Sartin v. State, 615 So.2d 135, 137 (Ala.Crim.App.1992), quoting C. Gamble, McElroy’s Alabama Evidence § 190.01(1)(4th ed.1991) (citations omitted).”
Brown, 821 So.2d at 225.
Here, the evidence at trial established that Horton was arrested for an unrelated crime a few days after the murder. Although the exact timing is unclear from the record, it appears that within a few days of his arrest, a commitment hearing was held and Horton was ordered to Bay-Pointe Hospital for a mental evaluation. While at the hospital, Horton escaped. Because Horton was in jail when he was ordered to BayPointe Hospital, his escape from the hospital was the equivalent of an escape from jail, We recognize that Horton was not in jail for Romprey’s murder at the time of the escape—he was not arrested for the murder until April 26, 2010. We also recognize that the State argued at trial that because Cpl. Tunink never questioned Horton about the murder and never told Horton about the murder, Horton could not have known that he was a suspect in the murder. However, merely because Cpl. Tunink did not inform Horton that he was a suspect in the murder does not establish that Horton was unaware that he was being investigated in connection with the murder. Indeed, in *50 the telephone calls Horton made to Adams from jail, Horton specifically told Adams that the police wanted to question him about a murder and he said that he was “on the run” from a murder charge. Horton was clearly aware that he was being investigated in connection with Romprey’s murder. Therefore, evidence of his escape from jail was relevant to his consciousness of guilt.
Similarly, Horton’s threat to shoot anyone who did not help him get out of jail and to burn their houses down was also relevant to consciousness of guilt. See, e.g., People v. Evans, 209 Ill.2d 194, 222, 283 Ill.Dec. 651, 667, 808 N.E.2d 939, 955 (2004) (statement by accused that if he prevailed on his criminal case he would kill his grandmother because she had helped the police in the murder investigation held admissible as evidence of accused’s consciousness of guilt); People v. Turner, 128 Ill.2d 540, 561-62, 539 N.E.2d 1196, 1205, 132 Ill.Dec. 390, 399 (1989) (statement by accused that he would kill his cellmate if cellmate interfered with his escape was admissible as evidence of accused’s consciousness of guilt); and Abram v. State, 95 Nev. 352, 356-57, 594 P.2d 1143, 1145 (1979) (statement by accused that he was “going to get” his girlfriend for “turning state’s evidence against him” was admissible as evidence of accused’s consciousness of guilt).
We recognize that in Alabama “[i]t is a basic and fundamental principle of evidence that in a murder prosecution, it is not permissible to show a difficulty between the accused and a third person not connected with the victim or the offense.” Caylor v. State, 353 So.2d 8, 10 (Ala.Crim.App.1977). “ ‘However, where their connection with the offense sufficiently appears, evidence of prior [or subsequent] difficulties between [the] accused and a third person is admissible.’” Hellums v. State, 549 So.2d 611, 614 (Ala.Crim.App.1989) (quoting 40 C.J.S. Homicide § 209 (1944)) (emphasis omitted). The test to be applied in determining whether a defendant’s threat to kill a person other than the murder victim is admissible “is whether there was a reasonable and sufficient connection between the threat to the third person and the killing.” State v. Ramirez, 116 Ariz. 259, 266, 569 P.2d 201, 208 (1977). In this case, we believe there was a sufficient connection between Romprey’s murder and Horton’s threat to kill people and burn their houses down. Unlike the threat Horton made to throw his girlfriend in a fire, see Part I.B. of this opinion, the threat to shoot people and then burn their houses down involved the same unique circumstances as Romprey’s murder—Rom-prey was shot and her mobile home was then burned down.
Therefore, we hold that the trial court properly admitted evidence that Horton had escaped from BayPointe Hospital and that he had threatened to shoot anyone who did not help him get out of jail and to burn their houses down.
B.
We hold, however, that the remaining collateral-act evidence—Horton’s use and sale of drugs, his assault on his mother, and his assault on Adams and the threat to throw Adams into a fire—was not admissible and that its admission constituted plain error,
1.
First, we easily reject the State’s argument presented at trial that evidence of Horton’s collateral acts was admissible to rebut his insanity defense, the State’s argument on appeal that evidence of the collateral acts was admissible to rebut Horton’s diminished-capacity defense, and the State’s argument on appeal that evi *51 dence of the collateral acts was admissible as evidence of intent.
Horton initially pleaded not guilty and not guilty by reason of mental disease or defect. However, just before trial began, Horton withdrew his plea of not guilty by reason of mental disease or defect. Although collateral-act evidence may be admissible in some circumstances to rebut an insanity defense, see, e.g., Ex parte Vaughn, 869 So.2d 1090 (Ala.2002), it is obviously not admissible to rebut an insanity defense that is withdrawn before trial.
The State also asserts on appeal that, despite the withdrawal of his insanity defense, “Horton’s main defense at trial was to continue to try and show that he was in some way mentally disturbed (or altered by drugs), and that this diminished his capacity, and thus he should not be held accountable for his crime” (State’s brief, p. 18), and that because defense counsel agreed with the State’s assertion during opening statements that Horton was acting strangely in the weeks leading up to the murder and then attempted to use that evidence to his advantage, Horton effectively invited any error in the admission of the collateral-acts evidence.
After thoroughly reviewing the record, it is clear to us that,' contrary to the State’s assertion, Horton’s main defense during the guilt phase of the trial was not that he was mentally disturbed or had diminished capacity[12] but that the State’s evidence was not sufficient to connect him to the scene of the crime.[13] The overwhelming majority of both defense counsel’s opening statement and closing argument focused on the lack of any direct evidence linking Horton to Romprey’s mobile home. Similarly, defense counsel’s cross-examination of witnesses was primarily directed to the lack of evidence connecting Horton to Romprey. Certainly, defense counsel reminded the jury that Horton was suffering from mental-health issues around the time of the murder, just as he reminded the jury that Horton was only 18 years old at the time- of the crime. Defense counsel also elicited testimony regarding Horton’s mother’s attempt to have Horton involuntarily committed because of his mental-health problems. However, the fact that defense counsel conceded that Horton was behaving strangely and attempted to explain that strange behavior does not equate with invited error. The record reflects that defense counsel was aware that the State was going to present evidence of his strange behavior, was going to offer the collateral-acts evidence against him, and likely was going to mention some of that evidence during opening statements. Defense counsel then attempted to lessen the impact of that evidence and to use it to Horton’s benefit by pointing out Horton’s mental-health issues. We will not find invited error merely because defense counsel did his job by attempting to use the State’s evidence to his client’s advantage. Therefore, the collateral-acts evidence was not admissible to rebut a diminished-capacity defense that was not asserted during the guilt phase of the trial, nor was its admission invited error.
Furthermore, it is well settled that “ ‘[w]here the requisite intent is presumed or inferred from proof of the criminal act itself or where the intent of the *52 defendant is not in issue, evidence of other crimes is not admissible.’ ” Brewer v. State, 440 So.2d 1155, 1159 (Ala.Crim.App.1983) (quoting Wharton’s Criminal Evidence § 245 at 560 (C. Torcia 13th ed.1972)). As this Court explained in Hinkle v. State, 67 So.3d 161 (Ala.Crim.App.2010):
“Hinkle contends that because the jury could infer Hinkle’s intent to murder Caneshua from Hinkle’s use of a deadly weapon in effectuating the murder, the State could not present evidence of a collateral offense in order to prove intent. The Alabama Supreme Court has recognized that a defendant’s use of a deadly weapon to kill a victim is sufficient to give rise to an inference that the defendant intended to kill the victim. See, Ex parte Burgess, 827 So.2d 193, 199 (Ala.2000) (‘intent to kill may be inferred from the defendant’s act of using a deadly weapon’). Thus, by demonstrating that Hinkle used a handgun to shoot and kill Caneshua, the State produced sufficient evidence from which the jury could infer that Hinkle acted with the requisite intent to murder Caneshua Henry. However, this Court has held that once the inference has been created, the State may not present evidence of collateral offenses to support a showing of intent. See Hunter v. State, 802 So.2d 265, 269 (Ala.Crim.App.2000), quoting Brewer v. State, 440 So.2d 1155, 1159 (Ala.Crim.App.1983) (‘ “When the element the State bears the burden of proof on can ‘be inferred from the act itself,’ the State may not use extraneous offenses as circumstantial evidence of that element in its case in chief.” ’) (citations omitted). Accordingly, the trial court erred in allowing the State to present testimony regarding the prior altercation between Hinkle and Canesh-ua as evidence of intent to commit the charged offense, pursuant to Rule 404(b), because the facts of the murder already gave rise to an inference of intent.”
67 So.3d at 164. In this case, it was undisputed that Romprey was shot twice in the head with a revolver. The intent to kill could easily be inferred by the use of a deadly weapon. Therefore, the collateral-acts evidencé was not admissible as evidence of Horton’s intent.
2.
The State also proffered that the collateral-act evidence was admissible to show motive and as part of the res gestae of the murder.[14] The State argued at trial that approximately a month before the murder, Horton used cocaine once and suddenly began behaving strangely. He first became obsessed with the movie Scar-face and began talking to the “devil.” He then became extremely religious, preached to people and forced people to pray with him, and developed a belief that he was on a mission from God to punish people. This strange behavior and his belief he was to punish people, the State argued, was the motivation for the murder. During this period when he was behaving strangely, Horton assaulted his mother and was charged with domestic violence, brutally murdered Romprey, and assaulted Adams and threatened to throw her in a fire. Because Horton’s collateral acts either precipitated his strange behavior or occurred while he was manifesting the strange behavior, the State argued, they were relevant to Horton’s motive for the *53 murder and were part of the res gestae of the murder. We disagree.
The motive exception to the exclusionary rule has been explained:
“Evidence tending to establish motive is always admissible. Perkins v. State, 808 So.2d 1041, 1084 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other ground, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). See also 1 Charles W. Gamble, McElroy’s Alabama Evidence § 70.01(12)(e) (5th ed.1996). In discussing motive, the Alabama Supreme Court has stated:
“ ‘ “Motive is an inducement, or that which leads or tempts the mind to do or commit the crime charged.” Spicer v. State, 188 Ala. 9, 26, 65 So. 972, 977 (1914). Motive is “that state of mind which works to ‘supply the reason that nudges the will and prods the mind to indulge the criminal intent.’ ” C. Gamble, Character Evidence, [A Comprehensive Approach (1987)] at 42. “Furthermore, testimony offered for the purpose of showing motive is always admissible. It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.” (Emphasis in original, citations omitted.) Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988).’
“Ex parte Register, 680 So.2d 225, 227 (Ala.1994). ‘If the prior bad act falls within [the motive] exception, and is relevant and reasonably necessary to the State’s case, and the evidence that the accused committed that act is clear and conclusive, it is admissible.’ Boyd v. State, 715 So.2d 825, 838 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).”
Stephens v. State, 982 So.2d 1110, 1127-28 (Ala.Crim.App.2005), rev’d on other grounds, 982 So.2d 1148 (Ala.2006).
With respect to res gestae, this Court has said:
“‘Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term “res gestae” because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the “complete story” of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
“‘Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute “other crimes, wrongs, or acts” as is generally excluded under Rule 404(b). Other courts hold that Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that rule—i.e., that such acts are merely *54 offered, rather than to prove bad character and conformity therewith, to show all the circumstances surrounding the charged crime.’
“C. Gamble, McElroy’s Alabama Evidence § 69.01(3) (5th ed.1996) (footnotes omitted).
“‘[One such] “special circumstance” where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. Commonwealth v. Murphy, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting Commonwealth v. Williams, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the “res ges-tae” exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible “to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.” ’
“Commonwealth v. Lark, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988). Evidence of a defendant’s criminal actions during the course of a crime spree is admissible. See Phinizee v. State, 983 So.2d 322, 330 (Miss.App.2007) (‘Evidence of prior bad acts is admissible to “[tell the complete story so as not to confuse the jury.”’); Commonwealth v. Robinson, 581 Pa. 154, 216, 864 A.2d 460, 497 (2004) (‘The initial assault on Sam-Cali took place approximately two weeks before the Fortney homicide and Sam-Gali’s testimony provided the jury with a “complete story” of Appellant’s criminal spree from the Burghardt homicide in August of 1992 to Appellant’s capture in July of 1993.’); St. Clair v. Commonwealth, 140 S.W.3d 510, 535 (Ky.2004) (‘Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant’s prior crimes and bad acts that were part of a continuous course of conduct in the form of a “crime spree” that began with Appellant’s escape from an Oklahoma jail and ended with his flight from Trooper Bennett.’); People v. Sholl, 453 Mich. 730, 556 N.W.2d 851 (1996) (‘ “Evidence of other acts is admissible when so blended or connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Charo, 156 Ariz. 561, 565, 754 P.2d 288, 292 (1988) (‘“The ‘complete story’ exception to the rule excluding evidence of prior bad acts holds that evidence of other criminal acts is admissible when so connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Long, 195 Or. 81, 112, 244 P.2d 1033, 1047 (1952) (‘It is fundamental that the state is entitled to the benefit of any evidence which is relevant to the issue, even though it concerns the commission of the collateral crimes. If evidence of a collateral crime tends to prove the commission of the crime charged in the indictment, the general rule of exclusion has no application.’); State v. Schoen, 34 Or.App. 105, 109, 578 P.2d 420, 422 (1978) (‘The evidence, therefore, was relevant to complete the story of the crime charged.... The state is not required to “sanitize” its evidence by deleting background information to the point that the evidence actually presented seems improbable or incredible.’).”
Doster v. State, 72 So.3d 50, 87-89 (Ala.Crim.App.2010).
*55 As for Horton’s drug use and his sale of drugs to make money, there is no indication in the record that Romprey’s murder was motivated by drugs or that Horton’s use and sale of drugs was inseparably connected to Romprey’s murder. No evidence was presented indicating that Horton used drugs around the time of the crime or was intoxicated at the time of the murder and Horton did not inject the issue of intoxication into the trial,[15] as was the case in McGowan v. State, 990 So.2d 931, 961-62 (Ala.Crim.App.2003). There was also no evidence indicating that Romprey was involved in drugs in any way, or that Horton committed the murder to obtain drugs or to obtain money to purchase drugs, or to obtain payment for drugs he had sold, as in Revis v. State, 101 So.3d 247, 278-80 (Ala.Crim.App.2011), and Ingram v. State, 779 So.2d 1225, 1241-43 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000).
Although the State theorized at trial that the cocaine Horton used approximately a month before the murder was laced with something that caused his altered behavior and thus was inferentially linked to the murder, that theory was based on conjecture. The State presented no evidence indicating that the cocaine Horton used was, in fact, laced with anything that could have, or did, alter his behavior. Rather, the State presented only the unsupported speculation of Adams that she and others “thought” the cocaine had been laced with something because they could not explain Horton’s strange behavior.[16] The State’s theory also does not account for the additional evidence the State presented, through Horton’s interview with police, that he often smoked marijuana with his sister and that at some point in the past he had sold drugs to make money. Those acts, the record indicates, occurred at some point before Horton’s strange behavior began, have no apparent connection to his strange behavior, and have no connection to Romprey’s murder.
Moreover, Horton’s use and sale of drugs were not contemporaneous with Romprey’s murder, having occurred at least a full month before the murder, and they were not inseparable from the murder or part of a continuous transaction, such as part of a crime spree.
Therefore, we conclude that Horton’s use and sale of drugs was not relevant to motive and was not part of the res gestae of the murder. See, e.g., Dealto v. State, 677 So.2d 1236, 1238 (Ala.Crim.App.1995) (holding, on trial for murdering his landlady, that evidence indicating that the accused had used marijuana and cocaine in the past was inadmissible as evidence of motive; State’s argument that the accused’s money troubles were “ ‘inferentially linked to drug use, and such money problems are relevant to motive’ ” held to be “weak” and “unconvincing”); Tabb v. State, 553 So.2d 628, 630 (Ala.Crim.App.1988) (holding, on trial for capital murder, that evidence indicating that the accused was a drug addict and had moved to Alabama “ ‘to get off cocaine’ ” was inadmissible under any of the exceptions to the exclusionary rule); and Christian v. City of Tuscaloosa, 53 Ala.App. 81, 85, 297 So.2d 405, 408 (Ala.Crim.App.1974) (holding, on trial for possession of burglar’s tools, that evidence indicating that the accused was a drug addict, had been seen in *56 public in an intoxicated state, and had in his possession at the time of his arrest several prescription drugs for which the accused did not produce a prescription was inadmissible as “too indefinite, tenuous, and speculative for the purpose of showing motive” where there was no evidence indicating that the accused had intended to steal drugs or had ever previously committed a burglary to obtain drugs).
There is also no indication in the record that Romprey’s murder was motivated in any way by Horton’s assaults on his mother and Adams and his threat to throw Adams in a fire or that the assaults and threat were inseparably connected to the murder. Although the assaults and the threat occurred during the period of several weeks that Horton was acting strangely, just as Romprey’s murder did, that appears to be the only connection between the collateral acts and the murder. The State did not argue at trial, and does not argue on appeal, exactly how Horton’s assaults on his mother and girlfriend and his threat toward his girlfriend motivated him to commit the crime. And we fail to see how those acts toward the two people closest to him—his mother and his girlfriend—operated as the inducement that nudged the will and prodded the mind to brutally murder a complete stranger. See, e.g., Frye v. State, 185 So.3d 1156, 1163 (Ala.Crim.App.2015) (holding, on trial for first-degree rape and first-degree sodomy, that evidence indicating that the accused had previously physically assaulted the victim was not admissible to show motive because the record disclosed “no logical explanation for how or why [the accused’s] previous physical assault of [the victim] influenced, induced, led or tempted him to commit the now charged sexual-assault offenses”); and Moore v. State, 878 So.2d 328, 335 (Ala.Crim.App.2003) (holding, on trial for capital murder, that evidence indicating that the accused had previously been convicted of other violent crimes was not admissible to show motive “because there was no showing that the acts underlying the prior convictions had a logical tendency to lead-to any inference that [the accused], because he committed those pri- or acts, ... was motivated to commit the now-charged crime”).
We simply cannot say that these acts were so contemporaneous with Romprey’s murder—the assault on his mother occurred at some point in the month before the murder, although the record does not disclose exactly when, and the assault on, and threat toward, Adams, occurred three to four days after the murder—as to make them inseparable from the murder or part of a continuous criminal transaction. Moreover, Horton’s threat to throw Adams in a fire was not sufficiently similar to Romprey’s murder to make it admissible— Romprey was not thrown in a fire, but was shot and her mobile home set on fire after she was dead. See Part I.A. of this opinion.
Therefore, Horton’s assaults on his mother and Adams and his threat to throw Adams in a fire were not relevant to motive or part of the res gestae of the offense.
Moreover, even if Horton’s use and sale of drugs, his assaults on his mother and girlfriend, and his threat toward his girlfriend could be considered relevant to Horton’s motive or as part of the res ges-tae of the murder, after thoroughly reviewing the record, we have no doubt that the prejudicial effect of this evidence far outweighed it probative value.
As noted above, “[b]efore its probative value will be held to outweigh its potential prejudicial effect, the evidence of a collateral crime must not only be relevant, it must also be reasonably necessary *57 to the state’s case, and it must be plain and conclusive.” Bush v. State, 695 So.2d 70, 85 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997). This Court has also noted that “ ‘[o]ne of the specific criterion to be used, in deciding when prejudicial effect substantially outweighs probative value, is whether or not there exist less prejudicial means of proving the same thing. If such alternative, less prejudicial evidence exists, then such availability argues in favor of excluding the prejudicial evidence.’ ” R.D.H. v. State, 775 So.2d 248, 254 (Ala.Crim.App.1997) (quoting McElroy’s Alabama Evidence, § 20.01 at 63). As Professor Gamble has explained:
“In making ... a determination [as to whether the prejudicial effect of the collateral-act evidence outweighs its probative value], the court should consider at least the following factors. The first is how necessary the evidence is to the prosecution’s case—ie., whether there are less prejudicial ways of proving the asserted purpose. The availability of such alternate proof would mitigate in the direction of excluding the more prejudicial collateral crimes or acts. A second factor is the weight of relevancy or probative force of the evidence in terms of proving the purpose for which it is offered. Last, the court should consider the effectiveness of a limiting instruction in the sense of whether it would be effective, as a means of avoiding the prejudice of the jury’s using the act as a basis from which to infer commission of the charged crime, in limiting the jury’s use of the offered evidence to the stated purpose.”
Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 69.02(1)(c) (6th ed.2009).
“ ‘Prejudicial’ is used in this phrase to limit the introduction of probative evidence of prior [or subsequent] misconduct only when it is unduly and unfairly prejudicial. State v. Daigle, 440 So.2d 230, 235 (La.Ct.App.1983).
“‘Of course, “prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. 'What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though, not always, an emotional one.” State, v. Hurd, 360 A.2d 525, 527 n. 5 (1976), quoting McCormick, Handbook on the Law of Evidence § 185 at 439 n.31 (2nd ed.1972).’
“State v. Forbes,. 445 A.2d 8, 12 (Me.1982).”
Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App.1985).
In this case, the collateral-act evidence was not relevant to any issue in this case and, even if it could be considered relevant to motive or res gestae, its relevance is marginal, at best.
The collateral-act evidence was also not necessary to the State’s case. To be sure, evidence of Horton’s strange behavior in the weeks leading up to the murder and following the murder was relevant under the State’s theory of the case to establish a motive for the murder and to explain the complete story of the murder. However, the State could have presented, and in fact did present, abundant evidence about Horton’s strange behavior and his belief that he was on a mission from God to punish people without referencing Horton’s collate eral acts. Simply put, the State could have easily conveyed to the jury the extent of Horton’s strange behavior without also presenting evidence of his collateral acts. The collateral acts were superfluous to the State’s case and served no purpose other than to paint Horton as a drug-using, *58 drug-dealing criminal who had a propensity to commit violent crimes against women.
Finally, the trial court in this case gave no limiting instruction to the jury as to the limited purpose for which it could use the collateral-act evidence. Therefore, the jury was free to use this evidence for the broad—inadmissible—purpose prohibited by Rule 404(b)—as indicating that because Horton committed other crimes, he was more likely to have committed the murder.
Therefore, we conclude that the prejudicial effect of the collateral-act evidence far outweighed its limited probative value. See, e.g., Ex parte Smith, 581 So.2d 531, 534-36 (Ala.1991) (holding, on trial for capital murder, that evidence indicating that the accused had sexually assaulted another woman the same day he had kidnapped the murder victim was not admissible even if marginally relevant to prove res gestae and motive because the probative value of the collateral crime was dubious and its prejudicial effect high); Draper v. State, 886 So.2d 105, 120-21 (Ala.Crim.App.2002) (holding, on trial for multiple drug-related charges, that evidence indicating that the accused had previously been convicted of possession of cocaine was relevant to show motive but inadmissible because it was not necessary to the State’s case, its probative value was negligible, and its prejudicial effect was high); and R.D.H., 775 So.2d at 253-54 (holding, on trial for sex crimes, that evidence indicating that the accused was affiliated with the Ku Klux Klan was relevant to explain that the victim and his mother delayed reporting the crimes because of their fear of the accused but inadmissible because the victim and his mother’s fear of the accused could have been show by other, less prejudicial evidence).
Because evidence indicating that Horton used and sold drugs, that he had assaulted his mother, and that he had assaulted and threatened his girlfriend did not fit within any exception to the exclusionary rule and, even if it did, its prejudicial effect far outweighed its probative value, the trial court erred in allowing this evidence to be admitted.
Furthermore, we conclude that the erroneous admission of this evidence rose to the level of plain error and was not harmless. As already noted, plain error is “error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.” Ex parte Trawick, 698 So.2d 162, 167 (Ala.1997). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). Moreover, Rule 45, Ala. R.App. P., provides:
“No judgment may be reversed or set aside, nor new tidal granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
“After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was.” Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998). “The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small *59 errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.” Davis, 718 So.2d at 1164.
“ ‘Whether the improper admission of evidence of collateral bad acts amounts to prejudicial error or harmless error must be decided on the facts of the particular case.’ R.D.H. v. State, 775 So.2d 248, 254 (Ala.Crim.App.1997); Hobbs v. State, 669 So.2d 1030 (Ala.Crim.App.1995). The standard for determining whether error is harmless is whether the evidence in error was ‘harmless beyond a reasonable doubt.’ Schaut v. State, 551 So.2d 1135, 1137 (Ala.Crim.App.1989), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).”
Hunter v. State, 802 So.2d 265, 270 (Ala.Crim.App.2000). “[T]he harmless error rule excuses the error of admitting inadmissible evidence only [when] the evidence was so innocuous or cumulative that it could not have contributed substantially to the adverse verdict.” Ex parte Baker, 906 So.2d 277, 284 (Ala.2004).
Under the circumstances in this case, we cannot say that the unfair prejudice resulting from the admission of this evidence was harmless beyond a reasonable doubt or that it did not substantially contribute to the verdict. The State’s evidence against Horton was not ironclad, or even overwhelming. The State produced no witnesses or direct evidence placing Horton at Romprey’s mobile home at the time of the crime. His fingerprints were not found on any of the household items that were found at the bottom of the embankment, presumably thrown there by the murderer. Although Horton’s palm print and DNA were found on Romprey’s vehicle, which was discovered approximately 100 miles away from the scene of the murder, and although his DNA was found on a white knit cap found in the vicinity of the vehicle, his prints and DNA were not found on any of the items from Romprey’s vehicle that had been strewn about the side of the interstate, including the murder weapon. Additionally, Romprey’s DNA was not found on any of Horton’s clothing that was tested. The State’s circumstantial evidence was minimally sufficient to warrant sending the case to the jury on the issue of Horton’s guilt, but was not so strong and cogent as to lead this Court to believe that the collateral-acts evidence had no impact on the jury’s deliberations.
To buttress its weak case, the State presented substantial evidence regarding multiple collateral crimes and acts that, as already noted, painted Horton as a drug-using, drug-dealing, violent criminal. The State then emphasized some of that evidence during opening statements and closing arguments,[17] even arguing that Horton’s strange behavior was “not unusual for criminals.” (R. 1270.)
After thoroughly reviewing the record, we have no doubt that the improper admission of the collateral-act evidence had an almost irreversible impact on the minds of *60 the jurors, drawing their minds away from the main issue, and leaving them with the impression that Horton was a dangerous career criminal who must have committed the murder. Therefore, we conclude that the improper admission of this evidence was not harmless, and that it had an unfair prejudicial impact on the jury’s deliberations and adversely affected Horton’s substantial rights. Therefore, Horton’s convictions and his sentence of death must be reversed.
II.
Although we must reverse Horton’s convictions and his death sentence for the reasons stated in Part I of this opinion, we address another issue raised by Horton because it may arise on retrial. Horton contends that the trial court erred in admitting State’s Exhibit 183, the surveillance video from Country Breeze No. 6, the gasoline station and convenience store located approximately one and a half miles from Romprey’s mobile home, because, he says, the State failed to lay the proper predicate for its admission under the “silent-witness” theory.
At trial, the State presented the testimony of Lajena Grandquest and Marvin E. Irvin as a means to gain admission of the surveillance video. Grandquest testified that she was the manager of Country Breeze No. 6 and that she had worked there since the store had opened approximately two years earlier. The following then occurred:
“[Prosecutor]: Do you have video equipment?
“[Grandquest]: Yes, ma’am.
“[Prosecutor]: What does the video equipment do?
“[Grandquest]: It continuously records every day for like three or four months. We’ve got like eight cameras.
“[Prosecutor]: For surveillance purposes?
“[Grandquest]: Yes. Yeah.
“[Prosecutor]: And do you know how it works? Are you familiar with it?
“[Grandquest]: The only thing I am familiar with is being able to go back and look at stuff that happened inside the store. Outside, I don’t know how to record or nothing like that.
“[Prosecutor]: Okay. How long—Are you familiar with how long does it normally keep things saved?
“[Grandquest]: I think about three months.
“[Prosecutor]: Okay. And does the equipment or the video show a time stamp on it?
“[Grandquest]: Yes, ma'am.
“[Prosecutor]: And is the time stamp that’s on the video correct?
“[Grandquest]: The time stamp may not be, due to the time up and down. But the date—the date is usually right.
“[Prosecutor]: Okay. And what do you mean the time up and down? What does that mean?
“[Grandquest]: When the time goes to Daylight Savings Time or goes back, I have to go in there and adjust it.
“[Prosecutor]: And does it always—
“[Grandquest]: No, it don’t do it by itself. I have to do it.
“[Prosecutor]: Okay. And does it always get adjusted in the system?
“[Grandquest]: No.
“[Prosecutor]: So oftentimes the time is incorrect?
“[Grandquest]: Yes, ma’am.
“[Prosecutor]: And do you remember in April of 2010, around April the 16th, did a detective or officer with the Mobile County Sheriff’s Department come out to your gas station?
*61 “[Grandquest]: Yes, ma’am.
“[Prosecutor]: And did you assist him?
“[Grandquest]: Yes, ma’am.
“[Prosecutor]: And what was the purpose of him coming there?
“[Grandquest]: He was coming to copy information off of my DVR, my recorder.
“[Prosecutor]: Off of your video equipment?
“[Grandquest]: Uh-huh.
“[Prosecutor]: And did you give him access to that?
“[Grandquest]: Yes, ma’am.
“[Prosecutor]: And I am going to show you what has been marked as State’s Exhibit Number 183. And have you seen what’s on that video or that DVD?
“[Grandquest]: Yes, ma’am.
“[Prosecutor]: Okay. And do you recognize what’s on there?
“[Grandquest]: Yes, ma’am.
“[Prosecutor]: What’s on there?
“[Grandquest]: Our gas pumps and driveways.
“[Prosecutor]: Okay. And are those the surveillance videos from your gas station?
“[Grandquest]: Yes, ma’am.”
(R. 991-93.)
Irvin testified that he was the network administrator for the Mobile County Sheriffs Department’s computer system and was a “database system investigator.” (R. 993.) Irvin stated that Cpl. Tunink had asked him to retrieve surveillance video from Country Breeze No. 6 and that he went to the store on April 16, 2010. The following then occurred:
“[Prosecutor]: What did you do upon arrival at the Chevron?
“[Irvin]: Went to—Went into the office to the DVR system and started doing searches for the date and times that they needed.
“[Prosecutor]: Okay. Was that specific date April the 9th, 2010?
“[Irvin]: Yes.
“[Prosecutor]: Okay. And were you able to locate anything on that time-frame?
“[Irvin]: Yes. There was video on there. The system time on it was roughly an hour off, somewhere in that time.
“[Prosecutor]: And you said ‘the system time.’ What does that mean?
“[Irvin]: When I did a search for, say, seven o’clock, it was actually showing up I believe, it was showing up as eight o’clock or vice versa.
“[Prosecutor]: So the time stamp on there was incorrect?
“[Irvin]: Yes.
“[Prosecutor]: Okay. And did you download that video?
“[Irvin]: Yes.
“[Prosecutor]: How did you do that?
“[Irvin]: Put in my search parameters and copied it to a CD [computer disc]. Had the system burn it to a CD.
“[Prosecutor]: I’m going to show you what has been marked as State’s Exhibit Number" 183. Do you recognize this exhibit?
“[Irvin]: Yes, I do.
“[Prosecutor]: And what is that on that exhibit?
“[Irvin]: This is—I am sorry. I don’t understand.
“[Prosecutor]: I’m sorry. What’s on that DVD [digital video disc]?
“[Irvin]: Chevron, Ziegler [sic] and Highway 90.
*62 “[Prosecutor]: And have you seen that DVD?
“[Irvin]: Yes.
“[Prosecutor]: Is that the surveillance video that you downloaded?
“[Irvin]: Yes.”
(R. 994-96.) After this testimony, the State offered the surveillance video and it was admitted into evidence by the trial court.
In Ex parte Fuller, 620 So.2d 675 (Ala. 1993), the Alabama Supreme Court explained:
“There are two theories upon which photographs, motion pictures, videotapes, sound recordings, and the like are analyzed for admission into evidence: the ‘pictorial communication’ or ‘pictorial testimony’ theory and the ‘silent witness’ theory. [3 James H. Chadbourn,] Wig-more [on Evidence], supra, § 790 [(1970 & Supp.1991) ]; [2 John W. Strong,] McComick [on Evidence], supra, § 214 [ (1992) ]; and [William A.] Schroeder, [et. al., Alabama Evidence,] supra § 11-3 [ (1987 & Supp.1988) ]. The ‘pictorial communication’ theory is that a photograph, etc., is merely a graphic portrayal or static expression of what a qualified and competent witness sensed at the time in question. Wig-more, supra, § 790, and McCormick, supra, § 214. The ‘silent witness’ theory is that a photograph, etc., is admissible, even in the absence of an observing or sensing witness, because the process or mechanism by which the photograph, etc., is made ensures reliability and trustworthiness. In essence, the process or mechanism substitutes for the witness’s senses, and because the process or mechanism is explained before the photograph, etc., is admitted, the trust placed in its truthfulness comes from the proposition that, had a witness been there, the witness would have sensed what the photograph, etc., records. Wigmore, supra, § 790, and McCormick, supra, § 214.
“... The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the ‘silent witness’ foundation must be laid. Under the ‘silent witness’ theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the ‘silent witness’ theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So.2d 248 (Ala.Crim.App.1980),] test. Rewritten to have more general application, the Voudrie standard requires:
“(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,
“(2) a showing that the operator of the device or process or mechanism was competent,
“(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
“(4) a showing that no changes, additions, or deletions have been made,
“(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
*63 “(6) identification of the speakers, or persons pictured, and
“(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.[18]
“On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the ‘pictorial communication’ theory. Under this theory, the party offering the item must present sufficient evidence to meet the ‘reliable representation’ standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds.”
620 So.2d at 678.
In this case, no witness testified that the surveillance video accurately and reliably represented what he or she sensed at the time in question. Therefore, the State was required to lay a predicate under the “silent-witness” theory for admission of the surveillance video. The State failed to lay that predicate.[19] Specifically, the State failed to present testimony sufficient to satisfy the first three requirements under Voudrie v. State, 387 So.2d 248 (Ala.Crim.App.1980). The State presented no testimony that the surveillance system at the store was working properly and that it was capable of accurately recording at the time the video was made, i.e., that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded and that the resulting recording was accurate. Additionally, the State presented no testimony that the operator of the system was competent. When asked how the surveillance system worked, Grandquest testified that the only thing she was “familiar with” was the ability “to go back and look at stuff that happened inside the store.” As for the outside cameras, Grandquest said that she did not “know how to record or nothing like that.” As noted above, the surveillance video here was from one of the outside cameras, about which Grand-quest admitted she knew nothing. The State failed to lay the proper predicate for admission of the surveillance video; therefore, the trial court erred in admitting that video.
III.
For the reasons stated in Part I of this opinion, Horton’s capital-murder convictions and his sentence of death are reversed and this cause remanded for proceedings consistent with this opinion.[20]
REVERSED AND REMANDED.
*64 WINDOM, P.J., and WELCH, J., concur.
BURKE and JOINER, JJ., concur in the result.

. Smith testified that the “greatest degree of destruction” was in the area where Rom-prey’s remains were found and that "where the fire causes the most damage to the structure is where the fire started.” (R, 857.) Tally explained that although part of the structure remained at the south end of the mobile home, even the steel beams in the north end of the mobile home were warped, indicating that the fire "burned longer and hotter” in that area and that, therefore, that was the area where the fire began. (R. 877.)

. Testimony indicated that fingerprints were found on the flat-screen television but that the prints were "not quality enough to make a comparison.” (R, 946.)

. Alspaugh and her husband were on vacation at the time of the murder.

, Testimony indicated that Romprey had lived in Montana before she moved to Alabama.

. The specific highway was not identified at trial.

. Adams also mentioned a man identified in the record only as "Mr. James” as someone Horton had threatened. Defense counsel’s objection to any testimony regarding Horton’s alleged threats against Mr. James was sustained.

. Only a portion of the interview was provided to the jury. Before trial, the State conceded that Horton had requested a lawyer during the interview and that all statements made by Horton after his request were inadmissible. Both the video recording and the transcript were redacted. Because the portion of the interview provided to the jury ended in an abrupt and odd fashion—with Cpl. Tunink asking Horton specifically about Friday night and early Saturday morning (the time of the fire)—pursuant to agreement of the parties, the trial court instructed the jury that the remainder of the interview was not relevant to any issue in the case.

. All quotations from the interview are from the transcript of the interview—State's Exhibit 181.

. We take judicial notice of the fact that Good Friday was April 2, 2010, a week before the murder,

. Horton did not tell Adams what the charges against him were.

. At the pretrial hearing on Horton's motion in limine to prohibit the State from presenting collateral-acts evidence, the State indicated that Horton’s incarceration at the time of his interview was for the domestic-violence incident against his mother that had occurred in the month preceding the murder. However, the State did not present that evidence to the jury. At trial, the State elicited testimony from Cpl. Tunink that Horton was in jail at the time of the interview, but not for murder. The State also elicited testimony from Cpl. Tunink that law enforcement had previously been called to the Horton residence regarding domestic violence in which Horton was the suspect and his mother the victim. The State, however, presented no testimony that Horton was arrested for the domestic-violence incident or that his incarceration at the time of his interview was for the domestic-violence incident. Thus, although the jury could have inferred that Horton’s incarceration was for domestic violence, it could also have inferred that Horton's incarceration was for another wholly unrelated crime.

. Alabama does not recognize diminished capacity as a defense to a criminal charge. See, e.g., Jones v. State, 946 So.2d 903, 927 (Ala.Crim.App.2006).

. During the penalty phase of the trial, Horton did assert diminished capacity as a mitigating circumstance; however, that has no bearing on the admissibility of evidence during the guilt phase of the trial.

. The State did not assert at trial, and does not assert on appeal, that evidence of Horton’s collateral acts was admissible for any of the other purposes listed in Rule 404(b), and we agree that evidence of Horton's collateral acts was not admissible to show opportunity, preparation, plan, knowledge, or absence of mistake or accident.

. The State injected the issue of intoxication in this case.

. During closing arguments, the prosecutor effectively admitted that whether the cocaine was laced with something was pure speculation: “You heard [Adams] say her opinion was he might had gotten hold of some bad cocaine. Maybe he did, maybe he didn't.” (R. 1271.)

. In this regard, we point out that the State repeatedly reminded the jury that Horton was in jail on another crime when he was interviewed by police and when he made the telephone calls to Adams. As explained in note 11, supra, although the record before us reflects that Horton was in jail for domestic violence resulting from the assault' on his mother, the manner in which the State presented this evidence to the jury was so vague and ambiguous that the jury could have concluded that Horton had not only used and sold drugs and had assaulted and threatened his mother and girlfriend but that he had also committed yet another unknown crime. However, it was completely unnecessary and gratuitous for the State to even suggest to the jury, much less elicit testimony and repeatedly remind the jury, that Horton was in jail for anything other than Romprey’s murder.

. Because no statements were made on the video, this requirement does not apply in this case.

. Tellingly, the State does not argue on appeal that it laid the proper predicate for the admission of the video. Rather, the only argument the State makes on appeal is that the video was "corroborative” of the evidence indicating that Horton was at a church approximately three miles from Romprey's mobile home the night of the murder, (State’s brief, p. 63.) However, whether a piece of evidence is "corroborative” of other evidence does not determine its admissibility.

.Because we are reversing Horton’s convictions and sentences for error that occurred during the guilt phase of the trial, we need not address at this time the impact, if any, of the United States Supreme Court’s recent opinion in Hurst v. Florida, 577 U.S. -, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016), on Alabama's capital-sentencing scheme.